### SUTHERLAND PAPER CO. v. GRANT PAPER BOX CO. et al. (two cases).

#### Nos. 10101, 10103.

United States Court of Appeals
Third Circuit.

Argued May 5, 1950.

Decided August 7, 1950.

Raymond F. Adams, New York City, (Curt Von Boetticher, Jr., New York City, Mahlon E. Lewis, Pittsburgh, Pa., on the brief), for plaintiffs.

Wm. H. Parmelee, Pittsburgh, Pa. (Christy, Parmelee & Strickland, Pittsburgh, Pa., Carl E. Glock, Reed, Smith, Shaw & McClay, and Edmund K. Trent, and A. M. Oliver, all of Pittsburgh, Pa., on the brief), for defendants.

Before MARIS, GOODRICH, and HASTIE, Circuit Judges.

HASTIE, Circuit Judge.

## I

These appeals involve the validity and alleged infringement of United States Let-

ters Patent No. 2,031,036. The defendant, Grant Paper Company, is the owner of the patent by assignment from the inventor, the defendant, Carl G. Dreymann.[1] The plaintiff, Sutherland Paper Company, brought this action for a declaratory judgment that it did not infringe the Dreymann patent and that the patent was invalid.[2]

The patent in suit purports to describe a moisture and vapor-proof container wall useful in the preservation of foods. A wax layer or film intercalated between two layers of paper, cardboard, or other fibrous material, is said to serve to keep atmospheric moisture away from dry foods, such as breakfast cereals or crackers, and to keep moist foods, such as cakes and doughnuts, from drying out. The waxes described in the patent are said also to have the adhesive power necessary to operate as a binder for the fibrous materials and sufficient flexibility so that they will not crack when bent. Finally, the waxes of the patent are said not to penetrate the fibrous materials, and consequently, cartons and boxes thus made are not greasy to touch, and can be printed upon.

The claim of the patent principally involved in this suit reads as follows:

"3. A container wall for the packaging of material including a sheet or film composed substantially of an amorphous petroleum wax of an apparent melting-point of 120°–170° F., carrying a suspended colloid, and two sheets of fibrous material, the sheet or film of said wax intercalated between the sheets of fibrous material and constituting a film of adhesive uniting the whole."[3]

The initial difficulties in this case concern the construction of this claim. More particularly, they concern the language of the claim describing the intercalating film as composed of "an amorphous petroleum wax of an apparent melting point of 120°–170° F., carrying a suspended colloid".

The plaintiff contends that certain language of the specification limits this claim. The specification first identifies the base material of the intercalating material to be microcrystalline waxes [4] derived from petrolatum, which, in turn, is identified as a high-boiling point derivative of petroleum. It is stated that petrolatums "have properties that, modified by certain additions, render them adequate" for Dreymann's purpose. The specification then teaches the addition to these waxes [5] at high temperatures of certain resinous impurities which will, on the cooling of the compound to about the temperature at which the composition is to be applied to the fibrous material, form in the compound a colloidal suspension or gel. It is the formation of this gel that is stated to give the intercalating material its adhesive and ductile qualities. Illustrative examples of the materials to be added are then set out.[6]

1. The assignment by Dreymann was made subject to a veto power in Dreymann over any licenses issued under the patent, or any assignments of the patent.

2. The plaintiff also sought an injunction against assertions by defendants that it was guilty of infringing the Dreymann patent.

3. All of the claims of the patent seem to be in issue under the pleadings. But claim 3 is apparently the broadest.

4. These were at the time of the patent thought to be amorphous or noncrystalline. They are from time to time therefore referred to as "amorphous waxes". It is now known that they have crystals of microscopic size, hence, they are microcrystalline.

5. It is not altogether clear from the specification whether the additions are made to the relatively pure microcrystalline waxes or to the petrolatum, but it seems to be to the former.

6. Stated more fully in the language of the patent as follows:

"This material preferably consists of amorphous, substantially saturated compounds that have been formed from high boiling-point, non-saturated petroleum derivatives by way of polymerization and possibly by condensation (which products in the raw state are known commercially as petrolatum); and, more specifically, those higher melting substances separated therefrom and sold as petroleum wax. The invention, further, embraces a procedure in consequence of which the adhesive power and plasticity of these amorphous, substantially saturated compounds is increased. Such procedure consists in dissolving a lesser or

The plaintiff urges that it is clear from a reading of the patent that Dreymann did not regard these materials as native to the microcrystalline waxes or to the petrolatum from which they are derived. Consequently, the claim cannot be read as including the achievement of Dreymann's result through the use of materials native to the petrolatum.

The defendants, on the other hand, insist that the patent cannot be read so narrowly. They point out that the claim does not restrict itself to non-petroleum additions. They urge that Dreymann's invention was a useful article of manufacture made by taking advantage of the gel formation resulting from combining of amorphous, or microcrystalline, waxes with certain resinous materials. Consequently, it is not particularly important what the source of the resinous impurity is so long as it is substantially similar to the resins mentioned.

■ The court below agreed with the plaintiff on this issue of construction, and, as limited, the court held that the patent was valid.[7]

■ Although we agree that some of the language of the specification is consist-

ent with a narrower claim, we cannot regard it as inconsistent with the claim as written or as justifying the narrow construction given to the patent by the district court. It seems to us that the natural reading of claim 3 is that it attempts broadly to embody a wide range of substances which in conjunction with amorphous petroleum waxes under the conditions spelled out will exhibit colloidal properties and will at the temperature of application be sufficiently viscous to be a satisfactory adhesive. So long as the specification is reasonably consistent with this natural reading of the claim, we see no reason artificially to restrict the claim. It is true that the claim must be read in the light of the specification. I Walker, Patents (Deller, 1937) § 261. But we are not thereby required to conclude that Dreymann's specification exhausted the circumstances under which his invention would work. Nor do we think his language suggests that he tried to do so. Cf. Polygon Products Corp. v. Kant-Rust Products Corp., 3 Cir., 1923, 292 F. 569; Donner v. Sheer Pharmacal Corp., 8 Cir., 1933, 64 F.2d 217.

This, in substance, is the construction already given to this patent by the Court of Appeals for the First Circuit in a previous

---

greater amount of a substance that, on cooling to about the temperature at which the coating is applied, or just before solidification, forms in the compound a colloidal suspension or gel. I shall use the term colloidal suspension as inclusive of a gel.

"These colloidal suspensions or gels may be produced by adding to the base material certain substances which at low temperature are not at all or only partly soluble in the base material, but which can be rendered soluble either by increasing the temperature, or by adding also an intermediary substance in which both the base material and the gel-forming substance are soluble.

"As substances which will form colloidal suspensions or gels I may mention: metal stearates, natural and artificial resins (such as coumarone resin), modified phenol-formaldehyde resins, glycolphthalic acid resins, and other condensation and polymerization products on the market, as also copal and other gums, and so on. Among these coumarone resin, pnenol-formaldehyde resin, and

copal gum are best; and of these three I have found coumarone resin very satisfactory. In using coumarone resin a solvent should also be employed, and a suitable (and non-volatile) solvent is ester gum.

"There are other intermediary substances, solvents both of the base material and of the added substance, that may be employed: for example, rosin."

7. The court further held that, as limited, the patent was not infringed. Both the plaintiff and the defendants have appealed from this judgment. The defendants' appeal properly challenges the court's restriction of the scope of the patent and the holding that its patent, thus construed, was not infringed. The plaintiff's appeal purports to challenge the court's decision as to validity. As the plaintiff was held not to be infringing the defendants' patent, there is no basis for this appeal. The issues raised by the plaintiff, of course, are appropriately considered in connection with defendants' appeal.

suit brought by the now defendant, Grant, against another alleged infringer, Russell Box Company. Grant Paper Box Co. v. Russell Box Company, 1 Cir., 1946, 154 F.2d 729, certiorari denied sub nom. Russell Box Co. v. Grant Paper Box Co., 1946, 329 U.S. 741, 67 S.Ct. 79, 91 L.Ed. 639.

## II

The view we take of the meaning of the patent affects the issue of infringement. The district court's conclusion on that issue depended on a much narrower reading of the patent.

The plaintiff's proof in this case was an attempt to show first, that there were no non-petroleum resinous additives in its waxes, second, that there were not even any resinous materials native to petrolatum in its waxes, and third, that its waxes were composed only of oils native to petrolatum and of the microcrystalline waxes themselves.

The defendants' proof was an attempt to show that the waxes contained resinous impurities. There was no attempt to show that these were foreign to petrolatum.

The district court found that the "uncompounded petroleum wax used by plaintiff contains more than 90 per cent microcrystalline wax, the balance being oil." It concluded, of course, that there was no infringement. If that finding stands, even on the construction we have now given the patent, the plaintiff is entitled to prevail.

This brings us squarely to the defendants' claim that the trial court's denial of a motion by them for a continuance, made somewhat less than two weeks before trial, prejudiced their presentation of their case. This aspect of the case will be more readily understood if viewed against the whole history of the case.

It appears that this suit was filed by Sutherland on October 21, 1946. Pleadings were complete on February 27, 1947. In April, 1947, the defendant Dreymann filed a motion to be dropped as a party defendant, and defendant Grant filed a motion for judgment on the pleadings in respect to the bill for declaratory judgment and for a separate trial on certain issues. These motions were argued in May and disposed of a month later. During the summer of 1947 various depositions were taken which were filed early in 1948. On February 6, 1948, defendants filed a motion for summary judgment. On May 3, 1948, this was set for hearing on August 10, along with motions of defendants for discovery and production, and for rulings on answers to interrogatories. Hearing on these motions was held on August 10, 1948, and decisions made by the trial judge on September 23, 1948. As the trial had been set for October 4, 1948, the motions were decided less than two weeks before the trial was scheduled to begin. Moreover, the rulings of September 23 granted defendant discovery with respect to certain samples of the plaintiff's product, and further provided that defendants be allowed to inspect the plaintiff's plant at Kalamazoo, Michigan, at which time "copies of records can be made and samples obtained from the production line". On September 27, the defendants moved for at least a three month continuance representing that they had been prejudiced in preparing for trial by the delay in the ruling on motions which, had they been disposed of favorably to the defendants, would have made unnecessary certain trial preparation that had now become quite important. They pointed out that the denial by the court of certain elements of their motion for discovery and the denial of their right to answers to certain interrogatories made necessary additional preparation.[8] And finally, they represented that Dreymann, who was in charge of preparing the technical material, had been ill and was unable to work on tests necessary to establish the components of the plaintiff's waxes.

The trial court denied this motion. After judgment had been entered for the plaintiff, the defendants moved for a new trial setting out as one of the grounds therefor the refusal of the court to grant a continuance.

8. The lower court's denial of the defendants' motions on discovery and interrogatories does not appear to have been relied on as error.

There is no question that as a general proposition, the grant or denial of continuances is a matter within the discretion of the trial court. There is also no question that an abuse of that discretion is subject to correction by an appellate court. Here we find abuse of discretion. Zeal to dispose of pending litigation, commendable in itself, has resulted in deprivation of reasonable opportunity to make adequate preparation for trial. Though the court regarded the various motions which it denied on September 23 as not sound, it is clear that they were neither baseless nor frivolous. Defendants reasonably, even necessarily, postponed important and time consuming portions of their trial preparation until after decision on these motions. We cannot conceive how even the limited discovery granted defendants could have been of much use in absence of considerably more than two weeks to evaluate and interpret any data obtained and to work it into the framework of the defendants' presentation. In evaluating the court's action, we cannot ignore the fact that this was a patent infringement case which in its nature would involve technical and elaborate presentation. Moreover, the court's denial of information with respect to the technical tests to be performed by plaintiff would itself impose unanticipated burdens of preparation. To all this is added the handicap of hurried preparation during a period of ill health of Dreymann, the inventor and a key technician.

It is true that some delay in the early stages of this litigation may be attributable to the defendants. But we do not regard the lower court's denial of a continuance, in the posture of this case on September 23, 1948, as an appropriate reprimand.

The affidavits filed by the defendants in conjunction with their motion for new trial tend to show that defendants wished to present, but could not prepare within the time allowed, substantial proof tending both to establish affirmatively that the plaintiff's waxes carry resinous impurities and to show, negatively, the inadequacy of the tests relied on by plaintiff to prove the absence of such substances. It seems clear therefore that they were prejudiced by the action of the trial court, and that the case should be remanded to the district court for a new trial.

## III

A further important issue is raised. The plaintiff has strongly argued in this court that the Dreymann patent is invalid. It would not be sound judicial administration to remand this case for a new trial if it is now clear that further proceedings can result only in a finding of invalidity.

The plaintiff's challenge to the validity of the Dreymann patent is made under three heads. It is first argued that the patent is invalid because the specification and claims are insufficient and indefinite. It is next argued that material changes were made in the specification without a supplemental oath of invention being made. And it is finally contended that the patent is invalid for want of invention.

Our previous consideration of the proper construction of Dreymann's patent in large measure disposes of the plaintiff's claim of insufficiency and indefiniteness. We will not repeat that discussion here. Sutherland's principal objection seems merely to be that the patent does not reveal with exactitude all the possible substances which may be used. But it does reveal that the combination of resinous impurities of a certain class, some examples of which are listed, with microcrystalline waxes results in a gel formation adequate to the purposes of the patent. That is sufficient. Polygon Products Corp. v. Kant-Rust Products Corp., supra.[9]

9. The plaintiff also calls our attention to three of the findings of the court below to the effect that the patent was indefinite. Finding 13 recites: "The patent lists a series of examples comparing amorphous petroleum wax compositions forming the colloidal suspension embodying the asserted invention of the patent with compositions lacking this quality. The third example in the patent is an uncompounded commercial petroleum wax. The patent does not describe it as adequate for the purposes of the patent and there is no suggestion in the specification that it contains any of the substances described as characteristic

The difficulty with plaintiff's second objection, that changes were made in the application without a concurrent filing of a supplemental oath, is that plaintiff has failed to establish the importance of these changes. If we are correct in the construction we have given Dreymann's patent, then a change from a statement that petrolatum waxes were not adequate for the purposes of the patent to a statement that they were not always adequate has no material bearing on the substance of the disclosure. Moreover, this change seems to have been made because of the cancellation of a claim originally included in the application. When the description as originally filed is read in conjunction with this claim, it becomes clear that the challenged change was necessitated by an obvious discrepancy between the specification and the claim.[10]

Nor does a change from a statement that the base material of the article described might be either paraffin wax or petroleum wax to a statement that it must contain at least 20% of petrolatum wax appear to be of any greater significance. All that is affected is the statement of an outside limit of circumstances under which the patent will work. The result is not to change the claimed invention. Cf. Michigan Carton Co. v. Sutherland Paper Co., 6 Cir., 1928, 29 F.2d 179; 2 Walker, Patents (Deller, 1937) §§ 182, 254.

The plaintiff's third challenge to the validity of the Dreymann patent poses more difficult questions. They are not disposed of by our consideration of the con-

of the compositions of the patent." Finding 14 recites: "The patent is indefinite in that a man skilled in the art cannot tell from the patent in suit whether or not the petroleum wax of this third example is a composition carrying a suspended colloid." And Finding 15 recites: "The amount of additional substance required to form the composition of the patent cannot be determined by reference to effect on viscosity or effect on melting point. The patent gives no test for determining whether a composition is or is not a laminating composition".

There are several answers to the inferences drawn by plaintiff from these findings. First, as the defendants have pointed out, they are not altogether consistent with other findings made by the court. Particularly, Finding 44 indicates at least that the court found some specificity in the patent. It reads: "The patent specification on page 2, column 1, line 7 et seq., discloses how the amount of gel forming substance may vary, depending on the material used, and teaches that the substance should increase the viscosity beyond 65″ at 210° F. by the Saybolt universal viscometer. This gives the man skilled in the art exact information as to the condition required to produce an adequate adhesion."

Second, the Court's Finding 14 indicates that the situation with respect to the third example is wholly nebulous, that there are no standards in the patent of any sort which give any indication whether this example could serve the purposes of the patent, and that there-fore a reader of the patent would be completely confused. Actually, the finding was based on testimony of defendants' expert, Dr. Brooks, merely to the effect that you could not say affirmatively, without more information than was given in the list of examples, that the third example could serve the purposes of the patent. This evidence is not a sufficient basis for such a finding.

Furthermore, we do not think that the finding, even if accepted, would be particularly hurtful. Reading the patent as a whole, we do not think that the inadequacy in connection with this third example has sufficient bearing on the basic disclosure to justify the conclusion that the patent is invalid because indefinite. "[I]f the description in the patent is such that one skilled in the art can follow it and produce the result which the patent claims, it is sufficiently certain." Donner v. Sheer Pharmacal Corp., supra, 64 F.2d at page 220.

10. The cancelled claim purported to cover amorphous petroleum waxes to which nothing foreign to petroleum has been added, and the resinous content of which was unimportant. This was cancelled because it was too broad. The challenged change, however, was made before the cancellation to make the specification consistent with the claim. See Grant Paper Co. v. Russell Box Co., 1 Cir., 1945, 151 F.2d 886, 889–90 vacated, 1 Cir., 1946, 154 F.2d 729, certiorari denied sub nom. Russell Box Co. v. Grant Paper Co., 1946, 329 U.S. 741, 67 S.Ct. 79, 91 L.Ed. 639.

struction of the patent. Whether or not the Dreymann patent is invalid for want of invention depends on the state of the prior art. The question of invention is one of fact. Note, 43 Ill.L.Rev. 535 (1948); but cf. National Slug Rejectors, Inc. v. A.B.T. Manufacturing Corp., 7 Cir., 1947, 164 F.2d 333, certiorari denied sub nom. A.B.T. Manufacturing Corp. v. National Slug Rejectors, Inc., 1948, 333 U.S. 832, 68 S.Ct. 459, 92 L.Ed. 1116. The scope of that issue of fact is, in major part, defined for this case by the plaintiff's insistence that it is within the principle of Sinclair & Carroll Co. v. Inter-Chemical Corp., 1945, 325 U.S. 327, 65 S.Ct. 1143, 89 L.Ed. 1644.

The patent involved in that case was for an ink used in printing on non-absorbent papers, the kind of papers used in such magazines as "The Saturday Evening Post", "The New Yorker", and "Collier's". In order to avoid offset printing, it had been necessary for many years to set aside the paper on which printing had been done for one to twenty-four hours to permit it to dry. Quick drying inks had been found to dry on the printing rolls before they could be applied. And those inks which would not dry on the rolls had simply required too long to dry. Prior to the patent, an article had appeared describing this problem, and pointing out that the solution lay in the use of inks which would dry readily at elevated temperatures, but which would not dry at ordinary temperatures. Then, so long as the elevated temperature was below the temperature at which the paper would burn, the ink would remain wet while on the presses, and yet could be dried quickly with hot air so that the paper could be reversed and printing of the other side completed quickly. The speed of the operation of printing the magazines could thereby be substantially increased. In the course of seeking such an ink the patentee apparently simply had recourse to a journal which listed various inks in terms of their volatilities at various temperatures. He found such an ink, and used it in conjunction with heated rollers. It solved the problem.

The opinion of the Supreme Court pointed out that "Reading a list and selecting a known compound to meet known requirements is no more ingenious than selecting the last piece to put into the last opening in a jig-saw puzzle. It is not invention." 325 U.S. at 335, 65 S.Ct. at page 1147, 89 L.Ed. 1644.

The suggestion is made here by Sutherland that that in substance was all that Dreymann did. It is beyond argument that the requirements for an effective laminant had been explained prior to Dreymann. The Fiske patent,[11] issued in 1912, describes a laminated cardboard for making cartons for packaging food such as tea and biscuits possessing the quality of complete impermeability to air, particularly damp air, and pliable to the extent necessary for permitting of its being bent without detriment to its capacity to oppose the infiltration of moisture-laden air, and with the surface qualities of normal cardboard unaffected by the laminant. The patent states, in particular, the following:

"From the above description it is apparent that the substance employed to unite the three or more layers of fabric is one which shall be sufficiently viscous and of a character that when spread in a thin layer shall be practically impermeable by air and especially damp air. It must, however, also be a substance which will not either in itself, or by reason of incorporated oils or other not strongly coherent ingredients, tend to penetrate or permeate the card, it being the essence of this invention that the outer surfaces of the board shall be to all effects and purposes, card layers, having the usual or normal card qualities, whereas interposed between them are one or more sheets or layers of a viscous material impervious, when spread out into a thin layer, to air, and having the property of not sinking deeply into or penetrating the outer layers of the card, so that the board as a whole will be relatively air-proof without yielding up its properties as a flexible, bendable card-board suitable to be used as a container for merchandise."

11. U. S. Letters Patent No. 1,033,756.

Moreover, we think it is clear that many of the qualities of microcrystalline waxes which would enable them to serve effectively as laminants were known. Thus, the Diggs patent,[12] issued in 1936 prior to Dreymann's, points out the usefulness of amorphous hydrocarbon waxes for coating metal for insulating purposes. It is there explained that the adhesiveness of the compounds and their ductility are what make them particularly useful in this respect. A quality of adhesiveness to metal seems to indicate that the wax is a strong bond. A worker skilled in Dreymann's field would infer from the Diggs disclosure that the waxes there described would be worth trying in his work.

Again, the Bennett patent [13] of 1934, indicates that the qualities of the hydrocarbon waxes are perhaps improved by adding other materials. The treatment described in this patent is stated to have for its object the rendering of waxes, fats, resins, and like organic compound products "more viscous, more readily soluble in organic solvents, and of a nature, when in the molten state, to set and harden or congeal more slowly on being permitted to cool and embodying in the molten state a stringy or jelly-like structure." The process of carrying this out is described: " * * * a wax or other solid hydrocarbon, or vegetable or animal waxes * * *, or a resin such as rosin or ester gum, or condensation products of polyhydric alcohols and fatty acids * * * is caused to react with a compound * * * [which is non-liquid at ordinary temperatures, with a divalent or trivalent metal compound of a fatty acid containing more than 5 carbon atoms, or an ester of such compound], for example, aluminum cetylacetate, or with a metallic soap such as titanium abietate, barium oleate,

magnesium myristicatem etc., or esters thereof." The product produced is said to afford a "satisfactory substitute for paraffin in the water-proofing of textiles, fibres, and cordage; and thin films of this wax-like product are more flexible, more adhesive than the paraffin and also possess a higher melting point."

Just as in the case of the Diggs patent, the Bennett patent does not solve Dreymann's problem. However, it suggests to the skilled ways of dealing with the waxes to make them more satisfactorily meet the laminant requirements.

The Pearsall patent, [14] issued in 1934, describes various sources of petrolatum waxes and indicates that the qualities of the waxes may vary as different sources are used. The compositions of the patent are said to be flexible and tough and able to withstand climatic changes without being adversely affected. The patent points out that the qualities of petrolatum wax can be improved and that a better wax can be made more cheaply by mixing it with ester gum, polymerized turpentine and paraffin in certain proportions. The composition described is identified as consisting of petrolatum wax, ester gum, and in some cases, paraffin. Its qualities as a laminant are not considered.

The MacLaren patent, [15] much relied on by the plaintiff, describes a wax which is claimed to possess surface tackiness at ordinary temperatures. It is composed of a low and high melting point petrolatum wax and a small percentage of rosin.

While not exhaustive of all the outstanding literature,[16] we think that these patents sufficiently show in outline the kind of knowledge that was available to Dreymann as he sought to solve the moisture-proof box problem. They suggest, too, the na-

12. U. S. Letters Patent No. 2,050,428.

13. U. S. Letters Patent No. 1,955,527.

14. U. S. Letters Patent No. 1,968,907.

15. U. S. Letters Patent No. 1,905,923.

16. The Henderson patent, (U.S. Letters Patent No. 1,937,518—1933) also describes some of the characteristics of a wax which would meet Dreymann's problems. But Henderson seems to have been more concerned with coatings than with laminants. The same is true of the Charch patent issued in 1934, (U.S. Letters Patent No. 1,983,520). The Charch, Fleming (U.S. Letters Patent No. 1,616,849—1927), Stokes (U.S. Letters Patent No. 1,343,235—1920), and Beecher (U.S. Letters Patent No. 1,936,375—1933) patents, all seem to teach the use of paraffin as a laminant.

ture of the problem raised here in deciding the issue of validity.

Sutherland concludes that the analogy to the Sinclair case is thus made perfect. It reasons that all that Dreymann did, or at least, all that Dreymann needed to do, was to read over the material already extant and discover which of the described qualities of the described waxes fitted the edges of the puzzle posed by the described qualities of a good laminant.

An examination of the testimony presented below, and of the findings of fact prepared by the court below, leads us to the conclusion that there has been no adequate consideration of the validity of the Dreymann patent, as we have construed it, in the light of the prior art. Prior art patents, and articles on the subject, were introduced at the trial and are in the record. But we are without the benefit of explicit consideration and adequate analysis of some of the patents which seem to us, on reading, to be close to Dreymann. And we do not think that it can be satisfactorily determined from this record whether Dreymann's patent meets the standards set out in the Sinclair case. We do not regard as sufficient for either of these purposes the district court's compendious finding that the specific composition of the Dreymann patent was described before Dreymann in the MacLaren patent, in the Bennett patent, and in the Fietsch patent.[17] It is not at all clear to us that the substances used in these patents are chemically equivalent to those described by Dreymann. We certainly do not think that the record establishes that they are. Nor do we think that the record in-

dicates whether or not the compositions of these patents were satisfactory laminants.

These issues are ones which should in the first instance be considered by the district court. That court, unlike this court, will have the benefit of expert explanation of the meaning of these prior art patents and their significance in relation to each other and to Dreymann. Cf. Bell v. MacKinnon, 2 Cir., 1906, 149 F. 205; 2 Walker, Patents (Deller, 1937) § 246. The factual issue as to invention can thus be fairly determined. Findings, more useful and illuminating than those in the present record, can be made concerning the state of the prior art.

There has, moreover, been testimony to the effect that Dreymann's product was commercially successful in a market where the Dreymann product was apparently a high-priced one. The issue of invention in this case would seem to be sufficiently close so that this factor might well be relevant. Cf. Jungersen v. Ostley & Barton Co., 1949, 335 U.S. 560, 69 S.Ct. 269, 93 L.Ed. 235, 62 Harv.L.Rev. 1244 (1949); Goodyear Tire & Rubber Co. v. Ray-O-Vac Co., 1944, 321 U.S. 275, 64 S.Ct. 593, 88 L.Ed. 721. In this context it should be reconsidered.[18]

Judicial inability to deal adequately with complex patent litigation has been much decried. See, e. g., Borkin, The Patent Infringement Suit—Ordeal by Trial, 17 U.Chi.L.Rev. 634, 641 (1950). The difficulties inherent in adjudication in this field afford an additional reason for withholding appellate decision on an issue which can receive more thorough consideration and exposition on a new trial. The

17. U. S. Letters Patent No. 1,269,918.

18. Cf. Grant Paper Box Co. v. Russell Box Co., 1 Cir., 154 F.2d at page 731. The apparent commercial success of the Grant product was noted by the First Circuit as indicative of invention. A long-felt need, and a quick and almost universal acceptance of an invention, is sometimes eloquent testimony of invention. Cf. Patent Royalties v. Land O'Lakes Creameries, Inc., 2 Cir., 1937, 89 F.2d 624; see Learned Hand, J., dissenting in Jungersen v. Baden, 2 Cir., 1948, 166 F.

2d 807, 811–812, reversed sub nom. Jungersen v. Ostley & Barton, supra: "If all the information was at hand, why was the new combination so long delayed? What better test of invention can one ask than the detection of that which others had all along had a strong incentive to discover, but had failed to see, though all the while it lay beneath their eyes?" Cf. Note, 34 Cornell L.Q. 663 (1949). The court in the Grant case also properly noted the long and careful experimentation conducted by Dreymann.

936

public interest in the proper determination of this litigation, as well as the interests of the litigants, impels us to refrain from decision on the issue of validity until we are as fully informed as possible.

Finally, we regard it as of considerable importance that this patent has already been held valid by the Court of Appeals for the First Circuit. Grant Paper Box Co. v. Russell Box Co., supra. The public interest in finality of patent validity determinations has not prevailed over established principles of *res judicata*. But that interest is substantial. It, and proper respect for responsible adjudication, would seem to require the most searching examination of the facts prior to any assumption or conclusion that the First Circuit is wrong.

### IV

Other grounds of error are alleged, but we regard them as without substance.

The appeal in No. 10,103 will be dismissed.

The judgment of the district court in case No. 10,101 will be reversed, and the cause remanded for further proceedings consistent with this opinion.