660 F.2d 867
 BUSINESS ASSOCIATION OF UNIVERSITY CITY, University City
Business Association, Inc., Cheryl Bethea, and
Cedar Park Community Development Corporation
v.
LANDRIEU, Moon, Secretary of the Department of Housing and
Urban Development, and City of Philadelphia, and
Redevelopment Authority of the City of Philadelphia and
I.B.I.D. Associates, Resident Advisory Board, and Tenant
Action Group.
Appeal of BUSINESS ASSOCIATION OF UNIVERSITY CITY and
University City Business Association, Inc.
 No. 80-2717.
 United States Court of Appeals,
Third Circuit.
 Argued May 19, 1981.
Decided Aug. 5, 1981.
Rehearing and Rehearing In Banc Denied Sept. 29, 1981.
As Amended Oct. 13, 1981.
 
 Alice W. Ballard, Steven A. Hyman, Ralph David Samuel (argued), Samuel, Ballard & Hyman, Philadelphia, Pa., for appellants.
 Henry A. Stein, Mesirov, Gelman, Jaffe, Cramer & Jamieson, Philadelphia, Pa., for I.B.I.D. Associates.
 Peter F. Vaira, U. S. Atty., James G. Sheehan (argued), Walter S. Batty, Jr., Asst. U. S. Attys., Peter Campanella, John Abbott, Felice Weiner, U. S. Dept. of Housing and Urban Development, Philadelphia, Pa., for Moon Landrieu.
 Joyce S. Wilkerson (argued), George D. Gould, Arthur Schmidt, Community Legal Services, Philadelphia, Pa., for Resident Advisory Board and Tenant Action Group.
 Louis F. Hinman, III, Deputy City Sol., City of Philadelphia, Philadelphia, Pa., for City of Philadelphia.
 Carl S. Primavera, Philadelphia, Pa., for Redevelopment Authority of the City of Philadelphia.
 Before ADAMS, ROSENN and HIGGINBOTHAM, Circuit Judges.
 OPINION OF THE COURT
 A. LEON HIGGINBOTHAM, Jr., Circuit Judge.
 
 
 1
 Over the past two decades, Congress and several federal agencies have explored various policies for minimizing racial and economic segregation in American society. One such approach was recognized by this Court in Shannon v. HUD, 436 F.2d 809 (3d Cir. 1970). There, we held that the Civil Rights Act of 1968, 42 U.S.C. §§ 3601, 3608(d)(5) (1976), required the Department of Housing and Urban Development (HUD) to consider, before approving construction of proposed federally subsidized low income housing, its impact on racial concentration. The location of new housing, we observed, could lead to the "undue concentration of persons of a given race, or socio-economic group, in a given neighborhood," and thereby "have the 'effect of subjecting persons to discrimination ... (or) ... substantially impairing accomplishment of the (integrative) object of the' " 1968 Civil Rights Act. Id. at 820. When reviewing locations for proposed low income housing, therefore, HUD was obligated to weigh the need for "desegregation of housing" through some institutionalized method. Id. at 821. Accord Otero v. New York City Housing Authority, 484 F.2d 1122 (2d Cir. 1973). In light of Shannon and the subsequent passage by Congress of the Housing and Community Development Act of 1974 (the Act), HUD has since promulgated regulations requiring its officials to consider, prior to the approval of a new low income housing project, the impact of the project on the concentration of racial and low income persons.
 
 
 2
 In this case, we are asked to review HUD's approval of a new low income project in light of these statutory and regulatory obligations. Because we find that HUD's decision was based on a consideration of the relevant factors and does not constitute an abuse of discretion, we will affirm the decision of the district court upholding HUD's approval.
 
 I.
 
 3
 The Section 8 New Construction Program of the Housing and Community Development Act of 1974, 42 U.S.C. § 1437f(a) (1976) seeks to aid "lower income families in obtaining a decent place to live and (to promote) economically mixed housing." In Section 5301(c), Congress provided:
 
 
 4
 The primary objective of this chapter is the development of viable urban communities, by providing decent housing and a suitable living environment and expanded economic opportunities, principally for persons of low and moderate income.
 
 
 5
 The program stimulates construction by private developers of housing for low income families through a system of rent subsidies. Federal or state agencies normally provide low interest construction mortgages, underwritten by HUD, for private developers of approved construction projects for low income families.[1] After the project is built, HUD subsidizes the rental payments of the low income tenants under Section 8 up to a certain percentage of their income so they can afford housing which is at the same time economically profitable for the developer.[2]
 
 
 6
 Although the actual rental subsidies are only extended after the housing is built and rented, the Section 8 program necessarily requires review and approval by HUD of a proposal before private or local government resources can be committed for construction. Under the administrative regulations, HUD normally advertises that it has available funds for sites in a particular geographic area. See 24 C.F.R. § 880.203 (1979).[3] Prospective developers submit for HUD's review their "preliminary proposals," which must detail the location, size, intended rents, along with other pertinent information concerning their proposed projects. See 24 C.F.R. § 880.205 et seq. (1979). The administrative regulations promulgated by HUD require its officials to review these proposals for compliance with technical, financial, fair-housing/equal opportunity, and environmental requirements. See §§ 880.208 et seq. (1979). Compliance with the regulations provide the basis for many of the claims by the plaintiffs in the present action, and are outlined below.
 
 
 7
 The developers of proposals which are found by HUD officials to be conditionally acceptable submit "final proposals," which, if accepted, provide the basis of the final agreement between HUD and the developer, called an "Agreement to Enter Into a Housing Assistance Payments Contract." See 24 C.F.R. § 880.214 (1979). The Housing Assistance Payments Contract is entered into by HUD upon the successful completion of the project by the developer.
 
 
 8
 The administrative regulations relevant to the present appeal direct HUD officials to review site selections for their impact on the concentration of minority and low income families. Rule 24 C.F.R. § 880.112(c)(1) (1979) requires that:
 
 
 9
 The site shall not be located in: (1) an area of minority concentration unless (i) sufficient, comparable opportunities exist for housing for minority families, in the income range to be served by the proposed project, outside areas of minority concentration, or (ii) the project is necessary to meet overriding housing needs which cannot otherwise feasibly be met in that housing market area.[4]
 
 
 10
 Further, Rule 24 C.F.R. § 880.112(d) (1979) mandates:
 
 
 11
 The site shall promote greater choice of housing opportunities and avoid undue concentration of assisted persons in areas containing a high proportion of low income persons.
 
 
 12
 The present case concerns HUD's approval under Section 8 of a bid to construct low income housing at a site in West Philadelphia (the development). The land is owned by the City of Philadelphia. The previous administration in Philadelphia, according to all parties, compiled a "dismal" record in the construction of low income units in non-impacted areas. In May of 1979, after several earlier threats, HUD withheld 21 million dollars in block grants until the City Administration submitted an acceptable strategy for constructing 448 subsidized units for low and moderate income family households in non-impacted areas, and construction on at least 100 of these units had begun. App. at 446-47. The land at issue in the present case, which was originally designated for commercial use under the City's comprehensive plan, was rezoned on March 15, 1979 for residential use and offered to HUD as an acceptable location for non-impacted low income housing. A private developer, I.B.I.D. Associates, supported by the Philadelphia Office of Housing and Urban Development, proposed to build 70 low-rise federally subsidized townhouses on the presently vacant block.
 
 
 13
 The lot is located near the Northwestern border of the campus of the University of Pennsylvania, between 39th and 40th Streets and between Market and Ludlow Streets. This places the site on the northern border of Census Tract 88, which contains the University of Pennsylvania Campus and a great deal of the University and middle class community that lives adjacent to the University in West Philadelphia. Although there is some disagreement in definition, much of what is commonly referred to as "University City" is contained within this tract. At the time of the 1970 census, which is admittedly dated, the tract only had a 8.5% black population and a total 13.9% non-white population. App. at 423. The same tract was not densely populated having only a 23.2% family population. There has been some commercial development on the northern portion of the tract in the past few years, especially along Market Street, which runs directly North of the site. Nevertheless, a significant portion of the land, razed in anticipation of future economic development, is currently vacant. The census tract immediately to the West had a 18.6% black population and a total of 23.7% non-white population when the 1970 census was taken. Id.
 
 
 14
 Although the proposed site is on the northern border of the University Campus and residential community, it abuts what both parties agree is a poorer and more racially impacted section of Philadelphia. Census Tract 91, whose southern border runs along Market Street across from the proposed site, encompassed a 65.3% minority population, at the time of the 1970 census. Census Tract 92, whose southern border begins along Market Street two blocks to the West of the proposed development, had a 98.4% minority population at the time of the 1970 census. Directly across Market Street from the site in Tract 91 lies a Section 8 subsidized 20-story housing project named University Square. It contains 448 rental units for the elderly and disabled with a 50% black population. App. at 184. Another subsidized low-rise rental apartment, named Center Post Village, is situated immediately to the North of University Square. Seventy-eight of the 84 families living in that housing are black. The project proposed for 39th and Market Streets is expected to house a population which is 50% black.
 
 
 15
 Officials at HUD reviewed the proposal for the development at 39th and Market Streets as to its impact on concentration of minority and low income residents and its environmental effects. The developer made modifications to provide parks and sound barriers so as to separate the project from some of its commercial neighbors, as the environmental review had suggested. Thereafter, HUD officials approved the proposal.
 
 
 16
 On September 25, 1980, however, two local business organizations the Business Association of University City and the University City Business Association (Business Associations) brought suit against HUD seeking an injunction blocking approval of the development. They claimed that HUD had failed to give adequate consideration to the increased concentration of minorities and low income individuals that would result from the construction. Alternatively, they argued that even if HUD officials had "considered these factors," as a substantive issue, placement of the project directly adjacent to other low income housing and a racially impacted census tract allegedly constituted, as a matter of law, an impermissible concentration of assisted individuals and racial minorities. They further contended that the Act required HUD to assure that the housing construction constituted a rational utilization of land and resources. The failure by HUD to undertake such a review, in the plaintiffs' view, necessitates a remand for a reanalysis by the agency on this question.
 
 
 17
 After holding hearings on September 30, October 2 and October 6, the district court denied plaintiffs' motion for a preliminary injunction. On October 7, 1980, defendants moved for an expedited hearing schedule on the permanent injunction. They claimed that the rise in interest rates and the continued freezing of HUD funds until commencement of construction demanded an expedited decision. Although plaintiffs opposed the motion, the court expedited discovery and scheduling. Final hearings were held on October 27 and 28. The court entered final judgment for the defendants on all claims on October 29. Plaintiffs filed a timely appeal from the district court's decision, raising the claims discussed above as well as challenging the expedited hearing schedule ordered by the district court.
 
 II.
 
 18
 Whether HUD has fulfilled its obligation to evaluate the racial impact of proposed Section 8 housing depends on the depth of the review undertaken by its officials. Under Regulation 880.112(c)(1) (1979), the development could only have been approved if HUD officials properly investigated and determined that it was not in an "area of minority concentration." Of course, under the regulations, approval may be given to a project in an area of minority concentration where satisfactory housing alternatives exist "outside areas of minority concentration," or where there are "overriding housing needs which cannot otherwise feasibly be met in that housing market area." 880.112(c)(1) (i) and (ii) (1979). In this case, however, HUD officials clearly did not approve the project under this exception to the regulation, and the Department has not contended before this court that such an exception is appropriate in this case. Thus, the critical question we must address is whether HUD adequately considered whether the project was in an area of minority concentration.
 
 
 19
 The HUD official who undertook this review was Walter Valentine, a Fair Housing/Equal Opportunity Specialist for Northern Pennsylvania, Philadelphia, and parts of Delaware. Valentine had some preexisting familiarity with the project area, having served as a relocation specialist with the Redevelopment Authority for the City of Philadelphia between 1964 and 1968, and having been employed in his present position since 1973. Valentine has also been a resident of West Philadelphia since 1960.
 
 
 20
 Since Valentine's approval of the project by use of a HUD Section 8 checklist was not accompanied by a written explanation, the basis of his decision was developed in his testimony at trial. HUD's internal guidelines define areas with over a 40% minority population as racially impacted. App. at 172. Because HUD does not have any formal standards for determining the relevant area in which the proposed site was located, this became the critical focus of Valentine's review.[5] According to his testimony, he examined the racial composition of the census tract in which the site was located, Census Tract 88, as well as that of Census Tract 87, which is immediately to the West across 40th Street. They had a non-white population of 13.9% and 23.7%, respectively. The two census tracts to the North, 91 and 92, had a 65.3 and 98.4 percent non-white population, respectively. Recognizing that the census data was dated and that the census boundaries cut through the geographical area in which the project was to be located, Valentine supplemented the raw data with analysis of other factors. He discussed with local realtors what changes in racial composition and local land values had occurred in recent years, made a physical inspection of the site, and reviewed school statistics at the neighborhood Drew Elementary School. The most important addition to the census data, according to Valentine, was his personal knowledge of housing developments in the area.
 
 
 21
 On the basis of this review, Valentine determined that, even if the area may have been racially concentrated as of 1970 when the census was taken, it was less so at the time of his review. He testified that "the area has undergone extensive redevelopment and change since I have been in Philadelphia," with a "significant downward change percentage-wise of the number of minorities residing in that particular area" App. at 174. This had occurred not only in Census Tract 88, which covers the area to the south of the project, but also 91, whose southern boundary was along Market Street across the street from the project. Thus, Valentine concluded that the proposed project, which was expected to have a 50% minority population, would not be constructed in a racially impacted area.
 
 
 22
 The general standard of judicial review of an agency's decision, as set forth in the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (B), (C), and (D), is that the agency decision must be overturned if it was "arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law," or if the decision failed to meet statutory, procedural, or constitutional requirements.[6] Under this standard, a court must first "decide whether the agency has acted within the scope of its authority." Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). In this case, the Business Associations do not allege that the agency acted outside its zone of authority. The second level of inquiry, according to the Supreme Court is to
 
 
 23
 consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The Court is not empowered to substitute its judgment for that of the agency.
 
 
 24
 401 U.S. at 416, 91 S.Ct. at 823. Our review in the present case is even more limited because the district court has made independent findings of fact on the quality of the investigation undertaken by HUD and the demographic characteristics of the West Philadelphia community which it examined. Those factual determinations may only be overturned if they are clearly erroneous.
 
 
 25
 The Business Associations' primary challenge to HUD's decision appears to be that HUD, in determining that the area was not racially impacted, did not consider all of the relevant factors.[7] HUD supposedly neglected to evaluate the existence of low income units across the street from the site; "pretended not to see the two minority-impacted Census Tracts"; and "ignored its own requirements for investigation of racial impacting." Appellants' Brief at 23.
 
 
 26
 It is absolutely clear from the findings of the district court and Valentine's testimony, however, that HUD considered the proximity of the already existing low income housing sites and minority impacted census tracts. All of the factors raised by the Business Associations were known by Valentine and specifically weighed by him. Valentine did not confine his analysis to information from dated census tracts reports, as was the case in King v. Harris, 464 F.Supp. 827 (E.D.N.Y.), aff'd mem., sub nom. King v. Faymor Development Co., 614 F.2d 1288 (2d Cir. 1979), vacated, 446 U.S. 905, 100 S.Ct. 1828, 64 L.Ed.2d 256 (1980), aff'd mem. on remand, 636 F.2d 1202 (2d Cir. 1980). In King, the district court held that reliance on census tract boundaries "in vacuo" to define "area" for impaction purposes was arbitrary and capricious. Here, Valentine supplemented the census information through informal interviews and his own personal knowledge of "gentrification" in the West Philadelphia community.[8] Of course, appellants criticize Valentine's failure to undertake an extensive interview of local residents or real estate developers. We do not believe that given his experience in the area, Valentine was required to undertake any extensive formal review of housing changes in the neighborhood since the 1970 census. Such a judicial requirement could add significant costs to the already rising price of low income housing and, perhaps more importantly, substantially delay the construction of housing for the poor, a critical factor in this case in light of the withholding of federal funds. Our decision in Shannon, although not dispositive of the present appeal, only required housing officials to thoughtfully weigh the question of racial impact. It did not mandate the adoption of extensive procedures to investigate all housing possibilities which would result in undue delay to the start of construction. 436 F.2d at 822.
 
 
 27
 Although the appellants' claims are technically phrased as a challenge to the failure of HUD to consider certain factors, the Business Associations have also, in effect, challenged the weight given to these factors by Valentine. HUD supposedly "lost sight of the obvious relevant facts concerning the definition of the neighborhood," "neglected" to consider the nearby low income projects, "neglected" the nearby racially impacted census tracts; and "neglected" to observe the "highly commercial and institutional area" proximate to the site in Census Tract 88. Appellants brief at 23-24. In challenging HUD's decision on the grounds that it did not give proper weight to these factors, therefore, appellants are making a substantive challenge to the decision. On this question they must meet the heavy burden of demonstrating HUD has made a "clear error in judgment in defining the relevant area." Overton Park, 401 U.S. at 416, 91 S.Ct. at 823.
 
 
 28
 The definition of the relevant "area" is necessarily a highly subtle judgment which can be formed through an assessment of past, existing and future housing patterns, social interaction between members of the community, and economic development. Valentine concluded that the project was not in an impacted area principally on the grounds that it fell within an increasingly white middle class section of the City. The minority population of this section had been diminishing over the past decade through "gentrification," expansion of the University, and related commercial development. A Professor of Sociology, Dr. Van Til, testified that the residents of the new project would generally utilize some of the commercial, medical, and business facilities of this area. Valentine determined from his own knowledge and brief inspection of the area to the north of Census Tract 88 that there had been a reduction in the minority population there as well due to extensive clearance. App. at 179. On these grounds, he concluded that the project would not be in an impacted area.
 
 
 29
 The Business Associations' challenge to this judgment apparently is based on the view that locating a new development on the border of a geographical area which, if considered alone, would be impacted, is arbitrary and capricious in light of the prohibition against locating new housing in a racially impacted area. Census data would be determinative, as they see it, if the "site were physically moved 35 feet across the street" into Census Tract 91; in that event "there could be no question but that it would be part of an impacted area." Appellants brief at 23. The mere proximity to a racially impacted area is determinative, the appellants argue, because "the people who would be living at this site would much more likely relate to the neighborhood directly across the street, albeit part of the heavily minority impacted area, than to the highly institutional and commercial area to the south of the site in the non-impacted Census Tract 88." Appellants brief at 18.
 
 
 30
 The Business Associations would have us hold that it was a clear error of judgment for HUD not to find that mere proximity to a racially impacted area, not construction in a racially impacted area, was required. This argument contains within it an assumption that the population of the project, which will be 50% minority and situated on the border between an impacted and non-impacted area, will not interact with the predominately middle class and university populations which border its three sides. Housing decisions, as we have said, require a subtle assessment of past and future housing trends. Whether families living in the proposed development should best be characterized as part of the University community living in Census Tract 88 or a part of what Business Associations describe as the minority population in Census Tract 91, or some area in between, is clearly a judgment within the purview of informed administrative discretion. There is testimony from Valentine and Van Til which rebuts the Business Associations' assumption, and we certainly cannot say that HUD made a clear error in judgment in rejecting the Business Associations' assumption. We decline to hold as a matter of law that the population of proposed projects will necessarily become part of nearby racially concentrated communities.
 
 
 31
 Substantively, the Business Associations' attack on the method for identifying the relevant area is misconceived. Because the census tract which borders on the proposed project was in 1970 racially impacted does not mean that the area around the project which is only one part of the census tract is impacted today. Valentine testified that there had been some integration in the area to the north of the project. We cannot hold that the agency erred as a matter of law in failing to impute the racial characteristics of an entire census tract, as revealed in dated census information, to a particular area on its border years later.
 
 III.
 
 32
 The Business Associations' second claim is that HUD committed a clear error in judgment when it considered the impact of the development on the concentration of low income persons. According to 24 C.F.R. § 880.112(d) (1979), in order to be approved, "the site shall promote greater choice of housing opportunities and avoid undue concentration of assisted persons in areas containing a high proportion of low income persons."[9] The HUD economist who undertook this review for the Department was Gerard M. Lester. According to Lester's testimony, he first determined that the census tract in which the development was to be located was "an area of low or moderate income." App. at 261. To decide whether the proposed project would result in an undue concentration of assisted persons in the area, Lester used two techniques. First, he looked to the number of assisted persons living in Census Tract 88. Since he found that there were no other units, the proposed development would only have raised the number of assisted units to 2.8%. Second, Lester determined the number of assisted housing units within a half-mile radius of the site. Since he found that there would be 650 units if the proposed units were built, the percentage of assisted units in the area would only rise with the development to 5.8%, the city-wide average. Lester also made a site visit which confirmed that the existing units were across Market Street from the development. On these grounds he determined that the development would not cause an undue concentration of assisted persons.
 
 
 33
 Technically, appellants challenge Lester's decision, as they did Valentine's, on the ground that he did not give adequate consideration to a relevant factor in this circumstance, the existence of low income housing adjacent to the site. Thus, they would have us remand to HUD to "re-evaluate the site ... to tak(e) into consideration the existence of five hundred and thirty-two assisted housing units adjacent to the site...." Appellant's brief at 33. But, as in the case of Valentine, it is clear Lester was aware of and considered the factor. Therefore, we will interpret the Business Associations' claim to be that it was a clear error in judgment for Lester to base his decision on the number of assisted units in the census tract or in a one-half mile radius.
 
 
 34
 The construction of adjacent housing units does not necessarily constitute an undue concentration of assisted persons. If appellants' argument were accepted, the construction of 650 low income housing units in any one place would in itself constitute an undue concentration of assisted persons. Clearly, other factors, such as the surrounding neighborhood, transportation and commercial patterns, which Lester analyzed, are relevant. We cannot hold that HUD's decision was arbitrary and capricious.[10]
 
 IV.
 
 35
 The Business Associations next challenge HUD's site approval on the ground that HUD did not investigate or rule on the rationality of the utilization of this land for residential development. As evidence of this obligation, they point to a list of "secondary" objectives[11] of the Act summarized in its prologue. Title 42 U.S.C. § 5301(c) (1976) states in pertinent part:
 
 
 36
 The primary objective of this chapter is the development of viable urban communities, by providing decent housing and a suitable living environment and expanding economic opportunities, principally for persons of low and moderate income. Consistent with this primary objective, the Federal assistance provided in this chapter is for the support of community development activities which are directed toward the following specific objectives
 
 
 37
 (5) a more rational utilization of land and other natural resources and the better arrangement of residential, commercial, industrial, recreational, and other needed activity centers; ...
 
 
 38
 As the Business Associations see it, since one of the objectives of the Act is to promote "rational land use," HUD must specifically determine whether each site selection will further this goal. Because no official clearly determined that this site selection was economically rational, appellants would have us remand for a determination of economic rationality. In support of this view, the Business Associations offered the testimony of economist Richard Edelstein, who concluded that the most rational economic development for the area was commercial. App. at 337.
 
 
 39
 We do not read the general statement of objectives of the Act as strictly as appellants would have us. The mere fact that Congress concluded that low income housing projects would, as a secondary objective, lead to "rational land utilization" does not mean that they meant to require HUD to consider the site's most economically rational land use in each housing decision. This conclusion is reinforced by the fact that there is no substantive reference to the provision in the legislative history. If Congress had intended to mandate such a strict procedural hurdle that would, in effect, federalize zoning law, they would have done so in more precise terms than those found in § 5301 and its legislative history. It must be remembered that the agency most qualified to make coordinated decisions of future land utilization the local zoning agency must approve each project before construction begins. In this case, the Philadelphia Housing Authority has rezoned the site to permit residential development. We do not believe that Congress meant to require HUD to act as a federal housing authority after these local agencies have made their decision merely by the inclusion of a list of subsidiary objectives in the Act. The Business Associations have not referred us to a single case that has ever taken such a position, and we do not believe that Congress intended such a result.[12]
 
 V.
 
 40
 The final claim of the appellants is that the expedited hearing schedule established by the district court was an abuse of discretion because it unduly restricted their ability to prepare for trial. The Business Associations filed their complaint on September 25, 1980, seeking to enjoin the project. The district court denied appellants' motion for a preliminary injunction on October 7, 1980 and scheduled trial for October 27. The appellants requested a continuance but their motion was denied. The district court entered its findings of fact and conclusions of law on the denial of a preliminary injunction on October 10.[13] In that opinion, the district court indicated that whether the area was impacted depended on the definition of the relevant "area" and wrote that the issue was a "substantial question of fact." App. at 245. Further, the district court noted that the "status of housing city-wide" would have to be examined to decide whether the project could be built "in proximity to two other federally subsidized housing projects." App. at 247.
 
 
 41
 The gist of the appellants' argument is that in their view the "case was a relatively simple one" and the district court asked "for far more evidence" than was necessary or possible to gather in a short period of time. Appellants' Brief at 44. In support of the proposition that the court's denial of a continuance was an abuse of discretion the appellants rely on Sutherland Paper Co. v. Grant Paper Box Co., 183 F.2d 926 (3d Cir. 1950).
 
 
 42
 In Sutherland Paper, the court recognized "that as a general proposition, the grant or denial of continuances is a matter within the discretion of the trial court." 183 F.2d at 931. There, the defendants to a patent infringement suit claimed that the district court's denial of a continuance after the court decided certain motions two weeks prior to trial "which, had they been disposed of favorably to the defendants, would have made unnecessary certain trial preparation" was an abuse of discretion. Id. at 930. Our court remanded the case to the trial court because in a patent case, involving highly technical procedures, various tests had to be carried out on the patented articles and the validity of the plaintiff's processes had to be tested.[14]
 
 
 43
 Here, the appellants cannot argue that complicated scientific procedures had to be employed prior to trial. Nor can they contend that they were unaware of HUD's plans to allow development of the site. In fact, the Business Associations' attorneys were in contact with the Director of the Office of Housing and Community Development for the City of Philadelphia as early as June 14, 1979. In a letter of that date, counsel for the Business Associations discussed various sites in West Philadelphia to place the Section 8 housing. App. at 453. Clearly, this is not a case like Sutherland where the district court's delay in deciding critical motions and then its refusal to grant a continuance seriously prejudiced the litigant. Simply stated, Sutherland stands for the proposition that when a party is prejudiced by a justifiable reliance on the trial court, the denial of a continuance will constitute an abuse of discretion. See Fontana v. United Bonding Insurance Co., 468 F.2d 168, 169-70 (3d Cir. 1972).
 
 
 44
 We have concluded that in the circumstances of this case the trial court did not abuse its discretion by denying appellants' request for a continuance. The case was fully prepared and argued at the preliminary injunction hearing and the district court's opinion of October 10 set out what the judge believed to be the plaintiffs' burden at trial. In light of the fact that the City was operating under a 21 million dollar federal freeze until low income housing was built, it was not error for the district court to expedite the final hearing.
 
 VI.
 
 45
 Often there is a tendency almost like a hydraulic pressure to expand a doctrine beyond the limits of its logic. In this case the appellants seek to push the doctrine of integrated housing or non-impacted lower income housing beyond the limit of the logic in any of our prior cases, any civil rights statutes or any existing governmental regulations. If appellants' position were adopted, the consequence might be that minorities and low income persons would not be able to have any HUD-assisted housing built in a census tract area where the black population is under 10% and where the low income population is minimal. Ironically, if appellants' position were accepted the exclusion of minorities and the poor would be accomplished because business development groups, like appellants, believe that the most rational use of the land would be for commercial purposes.[15] The victims of poverty and discrimination would not be able to live in the commercial facilities which appellants prefer to have built on the site. The plaintiffs are responsible business persons who have no animosity against the poor or minorities, and probably would like for all citizens to have decent housing. But, under the guise of their concern about the poor and minorities, business interests would probably acquire this land, and the poor and minorities might be forced to live in areas far more racially concentrated and poverty-stricken than the proposed housing project at 39th and Market Streets.
 
 
 46
 One of appellants' complaints is the drawing of a dividing line down Market Street to define the area to ascertain racial concentration or low income impactment. They would prefer to move the line one block south and consolidate that additional block with Census Tracts 91 and 92. The drawing of the line at Market Street, appellants say, is too short-sighted. Yet, when the defendants choose a larger geographical area with a half-mile radius, then the appellants complain that the radius is too long for defining the area. But as Mr. Justice Holmes observed:
 
 
 47
 If in its theory the distinction is justifiable, as for all that we know it is, the fact that some cases, including the plaintiffs, are very near to the line makes it none the worse. That is the inevitable result of drawing a line where the distinctions are distinctions of degree: and the constant business of the law is to draw such lines.
 
 
 48
 Dominion Hotel Inc. v. State of Arizona, 249 U.S. 265, 269, 39 S.Ct. 273, 274, 63 L.Ed. 597 (1919). We find the appellees could permissibly draw the lines where they did and that there is no basis for granting the injunctive relief appellants requested. Though espousing with vigor fair housing concepts, appellants would create a condition for the poor and minorities which John O. Calmore has characterized as being "neither fair nor housing."[16]
 
 
 49
 For the foregoing reasons, we will affirm the judgment of the district court.
 
 ADAMS, Circuit Judge, concurring:
 
 50
 Although there is serious doubt in my mind whether the decision by HUD to approve the West Philadelphia project was a wise one, the issue before us does not involve the wisdom of the agency's action, as the Court might view it. Rather, it is a much more limited question.
 
 
 51
 The Administrative Procedure Act, 5 U.S.C. § 706(2)(A), provides that an agency decision is to be overturned only if it is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." And in Citizens to Preserve Overton Park v. Volpe, 401 U.S. 102, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971), the Supreme Court declared that in a situation like this one the judiciary is to determine
 
 
 52
 whether there has been a clear error of judgment ... Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The Court is not empowered to substitute its judgment for that of the agency.[1]
 
 
 53
 Since I cannot say, on the basis of the record before us, that HUD has acted arbitrarily or capriciously, has abused its discretion, or committed a clear error of judgment, I agree with the majority that the action of the agency may not be set aside.
 
 
 
 [1]
 Normally, the permanent mortgage commitment is provided by the Government National Mortgage Association. HUD is not a lending institution, but issues insurance to lending institutions. The mortgage to the developers in the present case was secured through tax free bonds issued by the Philadelphia Housing Finance Corporation, which was established by The Philadelphia Housing Authority. See Testimony of B. Altman, App. at 125
 
 
 [2]
 Under an agreement between HUD and the private developer, named a "Housing Assistance Payment (HAP) Contract," HUD is obligated to subsidize the difference between not less than 15% but no more than 25% of the families income and the contract rent. See 24 C.F.R. §§ 880.101; 880.118 (1979). Restrictions are placed on the owner however. His rental charge is limited to no more than 10% over the fair market rental for the unit as established by HUD. 42 U.S.C. 1437f(c)(1) (1976). Moreover, tenants may not be required to pay more than 25% of their gross income toward their rent. At least 30% of the assisted units must also be rented by families which earn no more than 50% of the local median. 42 U.S.C. § 1437f(c)(3); 1437f(c)(7); 1437f(f)(2) (1976)
 
 
 [3]
 Interested developers may obtain a packet giving further information and HUD's specific objectives for a particular area. See 24 C.F.R. § 880.204 (1979)
 
 
 [4]
 24 C.F.R. § 880.112(c)(1) (1979) has since been amended to read as follows:
 The site must not be located in:
 (1) An area of minority concentration unless (i) sufficient, comparable opportunities exist for housing for minority families, in the income range to be served by the proposed project, outside areas of minority concentration, or (ii) the project is necessary to meet overriding housing needs which cannot otherwise feasibly be met in that housing market area. An "overriding need" may not serve as the basis for determining that a site is acceptable if the only reason the need cannot otherwise feasibly be met is that discrimination on the basis of race, color, religion, creed, sex, or national origin renders sites outside areas of minority concentration unavailable....
 
 
 [24]
 C.F.R. § 880.206(c)(1) (1980). In HUD jargon, an area of minority concentration is called an "impacted area."
 
 
 [5]
 HUD has made an administrative decision to use census tract boundaries since economic and racial data is readily obtainable for them. Mr. Valentine revealed in his testimony that HUD also reviews data for the area surrounding the particular census tract in question. App. at 172
 
 
 [6]
 Both parties agree that this is the applicable standard. Section 706(2) (E) and (F), which mandate, respectively, review under a substantial evidence standard and a review de novo, are inapplicable. They concern, in the case of Section 706(2)(E), review of agency rulemaking, and, in the case of 706(2)(F), "action which is adjudicatory in nature and the agency factfinding procedures are inadequate" or "when issues that were not before the agency are raised in a proceeding to enforce nonadjudicatory agency action." Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971)
 
 
 [7]
 Appellants have requested a remand for reconsideration by HUD of the question of racial impact, rather than a remedy
 
 
 [8]
 Gentrification is a term used in land development to describe a trend whereby previously "underdeveloped" areas become "revitalized" as persons of relative affluence invest in homes and begin to "upgrade" the neighborhood economically. This process often causes the eviction of the less affluent residents who can no longer afford the increasingly expensive housing in their neighborhood. Gentrification is a deceptive term which masks the dire consequences that "upgrading" of neighborhoods causes when the neighborhood becomes too expensive for either rental or purchase by the less affluent residents who bear the brunt of the change
 
 
 [9]
 "Assisted persons" are defined as individuals living in federally subsidized housing units
 
 
 [10]
 The Business Associations also argue that HUD failed to consider in its decision the need to deconcentrate "low income persons," as allegedly required by one of the Act's secondary objectives:
 (T)he reduction of the isolation of income groups within communities and geographical areas and the promotion of an increase in the diversity and vitality of neighborhoods through the spatial deconcentration of housing opportunities for persons of lower income and the revitalization of deteriorating or deteriorated neighborhoods to attract persons of higher income.
 42 U.S.C. § 5301(c)(6) (1976). Even if we were to find that the statement of purpose necessarily obligated HUD to review concentration of assisted units for each site selection, as the Business Associations argue, we still would uphold HUD's approval because HUD's analysis under 24 C.F.R. § 880.112(d) (1979), discussed above, fulfilled this same objective.
 
 
 [11]
 See Aertsen v. Landrieu, 637 F.2d 12, 22 (1st Cir. 1980)
 
 
 [12]
 We have some difficulty in discerning how HUD could assure rational land uses in the context of low income housing. Publicly subsidized low income housing is frequently economically irrational, as economists use that word, because it is not built through the private market. Any judicially imposed review of the rationality of housing development could lead to more confusion than advancement of the objectives of the Act
 
 
 [13]
 Although the district court opinion was entered on October 10, apparently it was not received by the appellants until October 14
 
 
 [14]
 The court described the prejudice suffered by the defendants as follows:
 The affidavits filed by the defendants in conjunction with their motion for new trial tend to show that defendants wished to present, but could not prepare within the time allowed, substantial proof tending both to establish affirmatively that the plaintiff's waxes carry resinous impurities and to show, negatively, the inadequacy of the tests relied on by plaintiff to prove the absence of such substances. It seems clear therefore that they were prejudiced by the action of the trial court, and that the case should be remanded to the district court for a new trial.
 Furthermore, the court noted that the inventor and key technician essential to the defendants' case had experienced ill health during the expedited period. 183 F.2d at 930.
 
 
 [15]
 These businessmen are no longer supported in this litigation by any group which represents the poor, minorities, the government, the powerless, or the residents of the surrounding community
 
 
 [16]
 See Calmore, Fair Housing v. Fair Housing: The Problems With Providing Increased Housing Opportunities Through Spatial Deconcentration, 14 Clearinghouse Rev. 7, 8 (May 1980), where the author relates the following realities:
 In Washington, D. C., during September 19-21, 1979, the author attended a joint meeting with members of the Legal Services Community Development Block Grant Task Force, the Working Group for Community Development Reform, and the National Citizens Monitoring Project on CDBG. The monitoring experiences of these groups confirm that in many cities, large and small, the object of expanding housing opportunities through the spatial deconcentration of the nonwhite and urban poor, accompanied by the broad prohibitions related to building and rehabilitating federally-assisted low-income housing in impacted areas, is causing severe problems in meeting the housing and community development needs of low-income residents in such areas.
 One blatant local horror story involved the loss of 85 units of large family rental housing on the fringe of an urban renewal zone in Connecticut because HUD refused to approve a rehabilitation proposal on the ground that the building was too near other assisted housing. Eighty-five predominantly Spanish-speaking families lost their housing in a city with a near-zero vacancy rate, a four to eight year wait for public housing and a high condominium and commercial conversion rate. Everyone in the city, including the mayor, objected to HUD's decision. The building was demolished after the usual fires.
 The Legal Services attorney who related this story states:
 It is understandable, therefore, that I take particular exception to the utility of a rule which prohibits undue concentration of assisted persons in areas containing a high proportion of low-income persons. I can understand why it is not a good thing to have whole census tracts filled with wall-to-wall high rise housing projects. Density is the real issue and lack of parks, playgrounds, etc.
 What is wrong, however, with a whole census tract of rehabilitated row houses? Nothing, say HUD rules, unless the area is poor. Therefore gentrification is okay.
 
 
 [1]
 As Justice Frankfurter stated in S.E.C. v. Chenery, 318 U.S. 80 at 94, 63 S.Ct. 454 at 462, 87 L.Ed. 626 (1942), a landmark administrative law case:
 "If the action rests upon an administrative determination an exercise of judgment in an area which Congress had entrusted to an agency of course it must not be set aside because the reviewing court might have made a different determination were it empowered to do so."