The CITY OF LOVELAND, et al., Plaintiffs,

v.

Samuel R. PIERCE, Jr., et al., Defendants.

No. C–1–82–972.

United States District Court, S.D. Ohio, W.D.

March 11, 1983.

Leonard Slutz, Eric Holzpfel, William B. Singer, Santen, Santen & Hughes, Cincinnati, Ohio, for plaintiff Karl Brown.

Nicholas J. Pantel, Asst. U.S. Atty., Cincinnati, Ohio, Carolyn B. Lieberman, Asst. Gen. Counsel for litigation, Edward G. Weil, Dept. of Housing and Urban Development, Washington, D.C., for Dept. of Housing and Urban Development.

James W. Harper, Asst. Pros. Atty., Cincinnati, Ohio, for Bd. of County Commissioners, Hamilton County.

Mary Asbury, Legal Aid Society, Cincinnati, Ohio, for amicus curiae.

## OPINION AND ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

SPIEGEL, District Judge:

At the outset the Court wishes to thank all counsel for their excellent preparation and presentation of this difficult case. The Court was impressed with and appreciates the quality of the work performed by counsel for both sides.

After this decision was prepared, we were informed by counsel for plaintiff City of Loveland that the City of Loveland had formally withdrawn its opposition to the Loveland Pines Project and intends to dismiss its claims against defendants. However, since the individual plaintiffs have not yet dismissed their claims and it is important to the developer and to HUD that this matter of a preliminary injunction be resolved, we are entering this Opinion and Order already prepared. We have considered the additional information submitted by the parties and find that it does not change the opinion of the Court in any way.

For the reasons set out below, we find that plaintiffs have not shown a likelihood of success on the merits and that for that reason alone, the motion for a preliminary injunction should be denied. We find further, however, that plaintiffs have not shown that they will suffer any irreparable harm from development of the Loveland Pines Project and that those families in need of subsidized housing will suffer great harm if new housing is not made available in Hamilton County. There is an immediate need for additional subsidized housing in this county and the Court believes it is in the public interest that these units be built. Because of the importance to all parties of a final decision on the merits, all additional information must be submitted by April 21, 1983 and the Court will consider the case ripe for final decision at that time.

This matter came before the Court upon motion of the plaintiffs for a preliminary injunction (doc. 4) and federal defendants' memorandum in opposition (doc. 7). A hearing was held on November 15 and 16, 1982 and testimony presented by both plaintiffs and defendants subsequent to the hearing, additional memoranda and evidence were submitted to the Court and considered in the determination made herein (docs. 27–32). It initially was agreed that resolution of plaintiffs' motion would be delayed pending a decision by the Ohio Supreme Court on plaintiffs' appeal from an order of the state court that plaintiff City of Loveland issue a building permit to the developer of the proposed Loveland Pines Project. By letter of February 25, 1983, plaintiffs advised the Court that the Ohio Supreme Court had dismissed plaintiffs' appeal and that a demand for a building permit had been made upon the City of Loveland pursuant to the order of the state court. The matter is, therefore, ripe for decision.

This action was brought by plaintiffs, City of Loveland and residents therein, for judicial review of a decision of the Secretary of the Department of Housing and Urban Development (HUD), a federal agency, approving a site within the City of Loveland for development of additional units of new-constructed assisted housing. Plaintiffs claim that the agency decision was made in bad faith and in violation of its own regulations and of federal law.

The action is one for judicial review of the agency action under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701 et seq. Under the APA our standard of review is extremely narrow; agency action

may be set aside by a federal court only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). As defined by the United States Supreme Court, this means that an agency's decision must stand unless the administrator has failed to consider "relevant factors" or has made a "clear error of judgment." *Citizens To Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). In applying this standard, the Court is not "empowered to substitute its judgment for that of the agency." *Id.*

The following constitutes our findings of fact and conclusions of law.

## BACKGROUND INFORMATION

### The Community Development Block Grant Program

Title 1 of the Housing and Community Development Act of 1974 (the Act), 42 U.S.C. §§ 5301 *et seq.,* established the Community Development Block Grant Program (CDBG), whereby HUD makes grants to local communities for use in a wide variety of community development activities. CDBG money is not used to subsidize construction of new housing or to subsidize rent for persons needing housing assistance. Hamilton County is considered an "urban county" under the Act and, therefore, is entitled to CDBG funds pursuant to a formula based on population, extent of poverty, and extent of housing overcrowding. 42 U.S.C. § 5306(b).

One of the items that must be submitted to HUD as part of an application for a CDBG fund is a county Housing Assistance Plan (HAP). HUD regulations require that the HAP be developed by the county with full citizen participation in the development process. 24 C.F.R. § 570.303. The HAP contains a survey of the housing stock of the community, an assessment of the community's housing needs, a realistic goal for the provision of assisted housing, and a designation of the general location for proposed low-income housing. *See* 42 U.S.C. § 5304(c).

### HUD Housing Assistance Programs

Where a HAP identifies a substantial number of low and moderate income persons in need of housing assistance and sets goals for assisting those persons, there are two major HUD programs that can be used; the Section 8 Program and the Low-Rent Public Housing Program. This case concerns the Section 8 New Construction Program. Under this program, a developer of housing that is approved by HUD enters into an agreement with HUD prior to construction in which the developer promises to make a certain number of units available to low-income persons and HUD agrees to subsidize the rent on behalf of those tenants.

Because participation in housing programs generally is necessary to enable a CDBG grantee to achieve its housing assistance goals, the HAP contains a provision in which the grantee sets a goal for providing HUD-assisted housing. The type of assisted housing the community provides depends on its needs.

HUD in turn uses the HAP needs and goals in allocating housing assistance funds among cities and counties. However, the amount of funding available is generally insufficient to permit HUD to allocate enough to each area to satisfy the goals established in the HAP. Therefore, when HUD evaluates whether a grantee has been implementing its HAP, HUD often focuses on the extent to which the grantee has taken advantage of funds made available, rather than the total amount of assistance provided. If the grantee has used all of the funding HUD has made available, but HUD has not made enough funds available to fully meet HAP goals, HUD generally considers that the grantee has performed satisfactorily under its HAP.

Under the Section 8 New Construction Program, HUD makes funds available, usually once a year, by publishing a Notification of Funds Availability (NOFA), an advertisement published in local newspapers and sent to interested developers which informs local developers that funding for a certain number of housing units is available and invites them to submit project propos-

als for HUD to consider. In response to NOFAs, developers submit proposals which are reviewed by HUD for economic and market feasibility, design standards, environmental problems, and the suitability of the site and surrounding neighborhood. If there is not sufficient response to a published NOFA, HUD often informs the local CDBG recipient that failure to use those funds would make it difficult to meet the recipient's HAP goals and that the locality should take steps to assist developers in preparing satisfactory proposals. There are various ways in which a community can assist developers in selecting and preparing sites for development of HUD-assisted housing.

*Development of Hamilton County HAP*

In March of 1979 the Hamilton County Board of Commissioners formally adopted a Community Development Block Grant Application which included a three year HAP. This application was preceded by citizen participation procedures, including a public hearing. This HAP included the City of Loveland as an acceptable general location for HUD-assisted housing. In July of 1979 while HUD was reviewing the acceptability of the HAP, the county submitted a change to the HAP which removed Loveland from the list of acceptable general locations for HUD-assisted housing. This change was not adopted by the Board of Commissioners, and was made without any citizen participation and without a public hearing. Because this change was not to a "HUD approved" HAP, this change without citizen participation was technically permissible under HUD regulations. *See* 24 C.F.R. § 570.312(c). In July of 1979 HUD approved the HAP as changed, that is, with the City of Loveland excluded from the list of acceptable general locations for HUD-assisted housing.

In August of 1980 Robert A. Wood, president of the Hamilton County Board of Commissioners, sent a letter to Mr. Bill Riordan, director of community planning and development at the HUD area office in Columbus. Enclosed with the letter was a proposed amendment to the HAP that had been approved as part of the 1979 Community Development Application. This amendment reinserted the City of Loveland on the list of acceptable general locations for HUD assisted housing. Later in August of 1980 HUD approved this HAP amendment. This approval was technically at variance with the HUD regulations which state that a change in the general locations should be adopted by the board after citizen participation hearings.

*Conditioning of 1980 Community Development Block Grant*

During August of 1979, as part of HUD's review of the county's performance under the CDBG program HUD determined that the county had failed to use available housing assistance funds to meet its HAP goals. HUD, therefore, imposed certain conditions upon Hamilton County's receipt of certain funds under the CDBG programs. One of the conditions imposed on receipt of funds stated that the Block Grant would be reduced by ten (10%) percent or Five Hundred Thousand Seven Hundred ($500,700.00) Dollars if Hamilton County did not, by November 15, 1980, provide necessary local approvals for a project using fifty units of Section 8 New Construction Funds that had been made available in 1980 and not yet used. This condition was extended through 1980, 1981, and 1982, pending the attempts by Showe Builders, Inc., to find an acceptable and developable site for these units within Hamilton County. Two sites originally proposed by Showe ultimately had to be rejected. The first, was in the Village of Harrison, Ohio. Approval of this site required a zone change, which Showe was not able to obtain. The second was a site located on an old drive-in movie lot in an industrial area at Anderson Ferry and Crookshank Roads in the Western Hills area just outside the city limits of Cincinnati, Ohio. HUD refused approval of this site because of the adverse environmental conditions incident to the site. Showe's next proposed site was the one under consideration herein, the Loveland Pines site located in the City of Loveland, Ohio.

*HUD Approval of the Loveland Pines Site*

On February 9, 1982, developer H. Burkley Showe applied for HUD mortgage insurance for the Loveland Pines project. Section 213(c) of the Housing and Community Development Act requires that HUD afford the unit of general local government a thirty day opportunity to object to a Section 8 proposal on the grounds that the application is inconsistent with the locality's housing assistance plan. 42 U.S.C. § 1439. Under this statute if a local government claims that a project is inconsistent with its HAP, HUD may not approve the project unless HUD finds to the contrary. 42 U.S.C. § 1439(c). On March 1, 1982, in response to HUD's inquiry, the City of Loveland informed HUD that it opposed development of the Loveland Pines project. On March 10, 1982 the county informed HUD that the Loveland Pines proposal was consistent with the HAP and recommended that it be approved. On March 15, 1982 the Ohio—Kentucky—Indiana Regional Planning Commission (OKI) also notified HUD that it opposed approval of the Loveland Pines Project "due to the project causing impaction of low and moderate income housing in the area" (letter of March 12, 1982).

After approval of the Loveland Pines site by the HUD Cincinnati Service Office, in conjunction with the Columbus area office, the application was reviewed by HUD's Chicago Regional Office. The application was approved by the Chicago office on July 16, 1982. At the request of the City of Loveland, a further review of the Loveland Pines Project application was conducted by HUD's central office in Washington, D.C. The central office affirmed approval of the site by letter dated September 21, 1982.

### ANALYSIS

The factors that this Court must consider on a motion for a preliminary injunction are set forth in *Mason County Medical Association v. Knebel,* 563 F.2d 256, 261 (6th Cir. 1977):

1. Whether the plaintiffs have shown a strong or substantial likelihood of success on the merits;

2. Whether plaintiffs have shown they will suffer irreparable injury if the injunction is not granted;

3. Whether the issuance of a preliminary injunction would cause substantial harm to others; and

4. Whether the public would be served by issuance of a preliminary injunction.

As stated above, this action is brought pursuant to section 706(2)(A) of the APA which permits agency action to be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Thus, the first question before the Court is whether plaintiffs have demonstrated a strong or substantial likelihood of success on the merits of their claim that HUD acted in a manner that was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

Plaintiffs contend first that approval of the Loveland Pines site violates 24 C.F.R. § 880.206(d) which provides:

> The site must promote greater choice of housing opportunities and avoid undue concentration of assisted persons in areas containing a high proportion of low-income persons.

The City of Loveland is one of only three municipalities in Hamilton County that contains any subsidized housing. Loveland has approximately nine thousand residents and has two subsidized housing projects with a total of one hundred and seventy five units. Both existing projects are close to the proposed Loveland Pines site. The majority (ninety-one percent) of subsidized housing in Hamilton County is located in the City of Cincinnati, the City of Lincoln Heights has five percent, and Loveland four percent.

With regard to the neighborhood and site selection standards, plaintiffs argue that HUD's conclusion that the Loveland Pines site meet these standards was both arbitrary and made in bad faith.

Plaintiffs submit an affidavit prepared by David Paul Varady, Ph.D., associate professor of planning at the University of Cincinnati. In his affidavit Professor Varady utilized his own definition of neighborhood to demonstrate that the definition used by HUD was too broad to make a meaningful analysis of the impact of this project on the area. Moreover, Professor Varady used 1980 census data as his source of information regarding the number of low-income persons living in the area. Professor Varady compared these figures to those used by HUD which were generated from the 1970 census data. (All parties agree that the 1980 census data was not available to HUD at the time it reviewed this project, but plaintiffs argue it was unreasonable for HUD to use the 1970 data when the 1980 data was soon to be published.) Further, Professor Varady reasoned that HUD should have compared the concentration of low-income persons and assisted housing in the relevant neighborhood in Loveland with, not Hamilton County as a whole, but with the proportion of Hamilton County which is outside the cities of Cincinnati and Lincoln Heights. From all of this, Professor Varady concluded that development of the Loveland Pines site would result in an undue concentration of low-income persons in the neighborhood in which the Loveland Pines site is located.

Plaintiffs also argue that rather than follow its own regulations in evaluating the proposed Loveland Pines site, HUD's approval of the site was based upon an improper factor; the lack of acceptable alternative sites in Hamilton County and the perception of HUD that if these units were not constructed in Loveland, they would be lost to Hamilton County all together. Plaintiffs assert that defendants arbitrarily rejected the recommendations of persons within the department that Loveland Pines would result in an undue concentration of assisted housing in Loveland only so that some housing would be built in Hamilton County. Plaintiffs assert that this is an improper consideration and no basis upon which to approve a proposed site for assisted housing.

The question whether the proposed Loveland Pines site complied with the neighborhood site selection standard set forth in 24 C.F.R. § 880.206(d) was reviewed by HUD's Economic and Market Analysis Division (EMAD). Mr. Jack Brown, Director of the EMAD Columbus, Ohio office, testified at the hearing. He stated that the initial conclusion of his department was that the Loveland Pines site was marginal and that it should not be approved unless the developer could prove to the satisfaction of the Cincinnati Housing Division that it was the only available site in suburban Hamilton County.. He testified further that it had always been his opinion that the Loveland Pines site met the criteria but that he had been hoping that another site could be located within the county. In a letter drafted by him to Mr. Hessling, Executive Director of OKI, the analysis and conclusions of his department were reported (ex. R). In that letter it is pointed out that Loveland contains a significantly lesser share of lower-income persons that does the overall market area, including Cincinnati. It was also noted that most of existing assisted housing was in Cincinnati and Lincoln Heights. It was his department's conclusion that the proposed project would provide a non-traditional housing choice for lower-income Hamilton County residents that would not otherwise exist. The letter concluded

> Based on the relative dearth of assisted housing choices for lower income households in suburban Hamilton County, the lack of additions to the family assisted housing supply in this area in 1974, the severely limited housing opportunities outside of predominently lower income areas, and the moderate income character of the project area, we conclude that this site will not create a concentration of assisted housing in a lower income area and is, therefore, consistent with site and neighborhood standard 880.206(d).

This decision and recommendation was reviewed by HUD's Washington office at the request of plaintiffs and found to be correct.

■ The fact that plaintiffs' expert would have reached a different conclusion from the same set of facts is not proof to this Court that HUD acted arbitrarily or capriciously in reaching its decision. HUD has a wide range of discretion in selecting methods of analysis that are not to be second-guessed by this Court unless clearly in error or unless the record indicates that HUD did not take into account the appropriate factors. Contrary to plaintiffs' assertions, however, the record indicates that HUD did consider all of the relevant factors and concluded, even though reluctantly, that the Loveland Pines proposal did in fact meet the site selection criteria. We do not agree with plaintiffs that the only reason HUD approved the project was so that some Section 8 housing could be built in Hamilton County. To the contrary the record indicates that HUD in fact turned down another proposal for Section 8 housing because HUD concluded it did not meet environmental standards. The fact that there was some internal dispute over whether the site should be approved also is not proof that the site does not meet selection standards. Rather, we are convinced by the testimony of Mr. Brown that although the Loveland Pines proposal did meet the site selection standards, the agency would rather have seen the project located elsewhere. The fact that HUD's first choice was to locate a Section 8 new construction project elsewhere, however, does not mean that the Loveland Pines location was not also acceptable. The record indicates that approval of the Loveland Pines Project was given consideration at every level of the agency and that all of the appropriate factors were taken into account. EMAD conducted a statistical analysis of the area with the data it had available to it at the time. We can not find that there is any duty on the part of HUD to wait for the 1980 census data to be published and even if they had waited, we are not convinced that the conclusions reached by the agency would have differed significantly from the decision that was made. Further, it was not error for HUD to compare Loveland with all of Hamilton County, rather than with the areas outside of Cincinnati and Lincoln Heights. In sum, we find that there is no evidence that, with regard to the decision that the Loveland Pines site met the neighborhood site selection criteria found in 24 C.F.R. § 880.206(d), that the agency decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

Plaintiffs also argue that the Loveland Pines Project is not consistent with the County Housing Assistance Plan and that HUD, therefore, lacks the authority to approve it under 24 C.F.R. § 880.206(f). Plaintiffs assert that the 1980 Amendment to Hamilton County's HAP was invalid because it was not adopted in accordance with HUD regulations requiring a resolution of the governing body, the Board of County Commissioners, and was not made pursuant to citizen participation in the form of a public hearing. See 24 C.F.R. § 570.312(f). Plaintiffs argue, therefore, that the only HAP that was in effect at the time the Loveland Pines Project was approved was the HAP originally approved by HUD which contained the Loveland exclusion. Therefore, the site did not comply with the local HAP approved by HUD and the approval, therefore, is invalid.

■ Plaintiffs argue primarily that because the amendment was made without citizen participation and because it was never approved by the County Board of Commissioners, the HAP was never validly amended. For the same reasons argued by plaintiff, however, we find that the HAP was never validly amended in the first instance to exclude Loveland from its list of general locations for assisted housing. The only HAP ever approved by the County Board of Directors subsequent to citizen participation hearings included Loveland as a location for assisted housing. It was some time after the Board approved this HAP, that an amendment was suggested by some unidentified person acting on behalf of the county. This amendment was never approved by the County Board of Commissioners and was never the subject of a public hearing. We recognize that the regulation technically requires that a public

hearing is necessary only to amend a HAP that has already been approved by HUD, and this amendment was made prior to HUD's approval, but there remains the fact that the amendment excluding Loveland from the list of general locations was never formally approved by the County Board of Commissioners. These two facts taken together, the lack of citizen participation in this important amendment to the county HAP, and the fact that the amendment was never approved by the Board of Commissioners, leads this Court to conclude that the only HAP that applies in this case is the one originally approved by the County Board of Commissioners subsequent to citizen participation hearings and which included Loveland on its list of areas for assisted housing. Because the Loveland Pines site is located within an area designated in this original HAP, it was not error for HUD to conclude that the Loveland Pines· site is in conformity with the county HAP.

█ Further, even if this Court were to find that the county HAP excluded Loveland from its approved list of locations for assisted housing, and that the 1980 amendment was not sufficient to put Loveland back on the list, HUD still had authority to approve the Loveland Pines Project because the county supported the projection. 24 C.F.R. § 891.205(b) is the regulation which directs HUD to review each application to determine if it is consistent or inconsistent with the applicable HAP for the area in which the proposed housing is to be located. The subsection states:

> The field office finding of consistency or inconsistency shall be based on the information provided in the HAP, the application for housing assistance, and an analysis of the comments of the local government, including comments submitted by the chief executive officer on behalf of the local government and the A–95 clearinghouse on planning consistency and coordination.

Where, as here, the local government (Hamilton County) states that it does not object, it is within HUD's authority to determine that based on all relevant factors, the site is not inconsistent with the county HAP. This is further demonstrated by a recent change made in the regulation which now provides that HUD may not approve an application for newly constructed units in a location which is not within the general location specified in the HAP unless the HAP is amended. In contrast, it appears that the former regulation, under which this decision was made, gave HUD the discretion to approve the Loveland Pines Project even if it were not in compliance with the HAP. Therefore, even if we had not found that the HAP was never properly amended to exclude Loveland, we would still hold that HUD acted within its authority and discretion when it approved the Loveland Pines Project and that such a decision was not an abuse of that discretion.

Plaintiffs also charge that HUD's environmental review of the Loveland Pines site was inadequate and that HUD failed to consider the environmental consequences of approval of the Loveland Pines site and failed to study, develop, and describe appropriate alternatives to approval of the Loveland Pines site. Plaintiffs charge that the location of additional units in Loveland will have an adverse environmental consequence in the form of a further concentration of assisted persons in a low-income area.

The National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*, requires, *inter alia,* that a "major federal action significantly affecting the quality of the human environment" be the subject of an Environmental Impact Statement that examines the potential adverse environmental impact of that action. 42 U.S.C. § 4332(c). For purposes of approving Section 8 housing, HUD implements its responsibilities under NEPA pursuant to its own regulations, 24 C.F.R. § 50. In carrying out its environmental review responsibility, HUD has created three levels of review; Normal Review and Clearance, Special Review and Clearance, and a full Environmental Impact Statement.

HUD regulations set thresholds of project size for which the different levels of review

must be conducted. 24 C.F.R. Part 50, Appendix A–1. For Section 8 housing projects, a Special Clearance must be conducted for any project over two hundred units. The threshold for preparation of a full Environmental Impact Statement is from five hundred to twenty five hundred units, depending on the size of the metropolitan area in which the project is to be built. *See* 24 C.F.R. Part 50, Appendix A–1 and § 50.31(b). This does not mean that projects of lesser size never are subject to the environmental impact statement requirement. Regardless of the applicable threshold, if at any time "during the preparation of an Environmental Assessment, impacts are identified that may have a significant impact on the human environment, an Environmental Impact Statement shall be prepared." 24 C.F.R. § 50.21. Pursuant to its regulations, the Loveland Pines proposal was reviewed through the application of a Normal Clearance. Because HUD's review did not indicate a potential environmental problem, no Environmental Impact Statement was prepared.

Basically, plaintiffs claim that the Environmental Assessment prepared by HUD was not adequate to show that HUD had considered the environmental consequences of its actions. An agency employee named Judy Trutter performed the environmental clearance for the Loveland Pines Project. Following approval of that environmental clearance, it was reviewed by the Environmental Clearance Officer in the Ohio area office in Columbus, Dwight H. Adams. In a memo dated August 4, 1982 Mr. Adams criticized several aspects of the environmental clearance for Loveland Pines. His overall conclusion, however, is contained in the following language taken from Mr. Adams' memo of August 4, 1982

> I briefly discussed this project with (acting area manager) Mr. Havens and he assures me that the more major issues, at least, have been suitably addressed and resolved to your satisfaction. I do not, therefore, take issue with the Finding of No Significant Impact (FONSI) for this clearance and, as stated earlier, the purpose of this memorandum is primarily to

provide technical assistance and guidance which will be of value in the preparation of future clearances.

 In this case the Loveland Pines Project is consistent with local zoning for the site which provides for multi-family housing. Because this shows that local officials have considered the impact of residential development, such compliance has been held to create a presumption that the site will not have a significant effect on the environment. *See Maryland-National Capital Park and Planning Commission v. United States,* 487 F.2d 1029 (D.C.Cir.1973); *Town of Groton v. Laird,* 353 F.Supp. 344 (D.Conn.1972). Again, the fact that some people at HUD may have believed that the Loveland Pines site was inappropriate for the location of family assisted housing, it is not proof that the site is in fact incompatible. The record indicates that HUD did consider the environmental impact under its normal clearance review procedures and found it to be acceptable. We found that this complies with federal law and the regulations promulgated thereunder.

 Plaintiffs also charged that HUD further failed to "study, develop, and describe appropriate alternatives" to choice of the Loveland Pines site, as required by 42 U.S.C. § 4332(E). Primarily Ms. Trutter testified that she did not consider any alternatives to the Loveland Pines site in her environmental clearance review. She also testified, however, that she was aware that HUD had looked at two previous sites for the same developer. The developer, Burkley Showe, testified at the hearing that he had surveyed various sites throughout the county and had finally determined that this was the only available site with proper zoning that could be utilized at this point in time for Section 8 housing. The Loveland Pines site itself was an alternative to two other sites that had been rejected. The testimony of Mr. Showe convinced the Court that alternatives had been carefully considered and that there were no other sites available in Hamilton County for development of Section 8 multi-family hous-

ing at that time. Because HUD did, through the efforts of the developer, consider a number of alternative sites, we find that it complied with its obligation under the law.

We find, therefore, from the evidence presented that plaintiffs have not shown a likelihood of success on the merits of their claim that defendants acted in a manner that was arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law in their approval of the Loveland Pines site for development of Section 8 housing. For this reason alone, we would deny plaintiffs' motion for a preliminary injunction. We also find, however, that plaintiffs have not met their burden of proof on any of the other elements necessary for issuance of a preliminary injunction.

■ With regard to irreparable harm to the plaintiffs, we find that plaintiffs have not demonstrated that they will suffer irreparable harm if thirty-seven units of Section 8 housing are built within the City of Loveland. As noted above, HUD has concluded, correctly we believe, that the Loveland Pines Project will not result in an undue concentration of subsidized housing in an area of low-income persons. Plaintiffs have alleged that this project will result in the ghettoization of Loveland, but that claim has not been substantiated. Section 8 housing is not always disastrous to a community, as the Loveland experience has demonstrated. There is no basis for this Court to speculate that the addition of thirty-seven units of assisted housing for families will cause any harm to the area.

■ Further, we find that an injunction would cause substantial harm both to the developer of the project and its potential residents. The developer spent considerable time and money to prepare this project. The City of Loveland was aware long before it brought this suit that the site was being considered for development of subsidized multi-family housing and failed to object. In fact, the city approved an earlier proposal for subsidized housing on this same site. More importantly, however, an in-

junction would likely mean that this housing would never be built and the record is clear that assisted housing of this type is needed in Hamilton County. The Hamilton County Housing Assistance Plan shows that there are a great number of families in this county in need of this housing. We find that on balance, the injury to potential residents is much greater than any alleged injury to plaintiffs.

■ In this same vein, we find that the public interest requires additional subsidized housing in Hamilton County. HUD has long shown concern for the fact that Hamilton County has not complied with its goals in development of federally assisted housing. To deny construction of these units, would only further delay the efforts of the county and of HUD to develop housing for families that are in such need.

For the reasons set forth above we find that plaintiffs' motion for a preliminary injunction should be and is hereby denied.

SO ORDERED.