LA PLAZA DEFENSE LEAGUE, et al., Plaintiffs,

v.

Jack F. KEMP, as Secretary of Housing and Urban Development; et al., Defendants.

No. 89 Civ. 8182 (WCC).

United States District Court, S.D. New York.

July 10, 1990.

---

Law Office of Harry Kresky (Harry Kresky, of counsel), New York City, for plaintiffs.

Otto G. Obermaier, U.S. Atty., S.D.N.Y. (Kay K. Gardiner, Asst. U.S. Atty., of counsel), New York City, for the Federal defendants.

Berle, Kass & Case (Carol A. Buckler, Leslie A. Brueckner, of counsel), New York City, for defendant Lower East Side Coalition Housing Development, Inc.

Victor A. Kovner, Corp. Counsel of the City of New York (Vincent Torna, Asst. Corp. Counsel, of counsel), New York City, for David N. Dinkins, Mayor of the City of New York.

## OPINION AND ORDER

WILLIAM C. CONNER, District Judge:

Plaintiffs, an organization and residents of the Lower East Side of Manhattan,[1] move for a preliminary injunction to enjoin the funding of clearance and construction on a site located at 9th Street and Avenue C in the Lower East Side of Manhattan. Plaintiffs seek review of the decision of the Department of Housing and Urban Development ("HUD") to fund a project under Section 202 of the Housing Act of 1959, 12 U.S.C. Section 1701q, which would result in the construction of an eighty-unit low-income senior citizens residence on a site presently occupied by what plaintiffs describe as a "people's park" and cultural facility known to them as La Plaza Cultural. Plaintiffs claim that HUD's approval of the site violated various HUD regulations, including HUD regulation 24 C.F.R. section 880.206(d) which precludes HUD's support of projects which would result in an undue concentration of assisted persons in areas containing a high proportion of low-income persons. Plaintiffs name various HUD officials, the project's sponsor and the Mayor of the City of New York (the "City") as defendants. This Court conducted an evidentiary hearing limited to HUD's application of section 880.206(d) on May 17, 1990. This opinion ·constitutes the Court's findings of fact and conclusions of law pursuant to Rules 52(a) and 65(d), Fed.R.Civ.P.

## BACKGROUND

On or about July 14, 1988 the Board of Estimate of the City of New York approved the sale of the site to the sponsor of the housing project, defendant Lower East Side Coalition Housing, Inc. (the "Sponsor"), a non-profit organization, for construction of Casa Victoria, an eighty-unit senior citizens' residence (the "Project"). The Project is slated to contain twenty efficiency apartments and fifty-nine one-bedroom apartments, ten percent of which will be designed to accommodate handicapped tenants. One apartment is set aside for a superintendent. The site is located at the southwest corner of 9th Street and Avenue C, on the Lower East Side of Manhattan. The Sponsor received partial mortgage financing from HUD pursuant to Section 202.

Plaintiffs filed this action and moved for a preliminary injunction in December 1989, alleging that HUD's approval of the Project violated applicable HUD regulations, including one which required HUD to avoid an undue concentration of assisted persons in areas containing a high proportion of low-income persons. This action was stayed while HUD, on its own initiative, reviewed the site selection de novo as to the undue concentration factor and determined on or about April 19, 1990, that the Project would not result in an undue

---

**1.** Plaintiff La Plaza Defense League is an unincorporated association formed to prevent the destruction of the park known as La Plaza Cultural. Plaintiffs Steve Harrison, Mary Owens, Paul Terry, and Don Yorty are residents of the Lower East Side who have worked to develop and maintain the site.

concentration of assisted persons in the area. HUD therefore issued a renewed firm commitment and extended its reservation of funds for the Project. On May 1, 1990, plaintiffs served an amended complaint and again moved for a preliminary injunction to halt the Project.

## DISCUSSION

### I. Preliminary Injunction Standard

To obtain a preliminary injunction, the movant must show "both irreparable harm and a likelihood of success on the merits or a sufficiently serious question regarding the merits to make it a fair ground for litigation with the balance of hardship tipping decidingly in its favor." *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 972 (2d Cir.1989); *Fireman's Fund Ins. Co. v. Leslie & Elliott Co., Inc.*, 867 F.2d 150 (2d Cir.1989); *Le Sportsac, Inc. v. K Mart Corp.*, 754 F.2d 71, 74 (2d Cir.1985).

■ When a plaintiff seeks to enjoin governmental action taken in the public interest pursuant to a statutory or regulatory scheme, an injunction should issue only if the plaintiff proves irreparable injury and a likelihood of success on the merits. *See Plaza Health Laboratories, Inc. v. Perales*, 878 F.2d 577, 580 (2d Cir.1989); *Union Carbide Agricultural Prod. Co. v. Costle*, 632 F.2d 1014, 1018 (2d Cir.1980), *cert. denied*, 450 U.S. 996, 101 S.Ct. 1698, 68 L.Ed.2d 196 (1981). Defendants argue that this stricter standard should be applied in the instant case because HUD acted pursuant to a regulatory scheme furthering the public interest in low-income senior citizen housing. Because of the dire need for low-income housing for senior citizens and the handicapped, the Court will apply this heightened standard, although the result would be the same if the less-rigorous alternative standard were applied.

### A. Irreparable Injury

■ In order to satisfy the requirement of irreparable injury, plaintiffs must demonstrate "an injury that is neither remote nor speculative, but actual and imminent."

*Tucker*, 888 F.2d at 975 (quoting *Consolidated Brands, Inc. v. Mondi*, 638 F.Supp. 152, 155 (E.D.N.Y.1986)). The injury must be one requiring a remedy of more than money damages. *Id.*

■ Plaintiffs contend that they will suffer irreparable injury in the form of the destruction of La Plaza Cultural and the construction of a housing project which, because it does not meet HUD regulations, will increase the undue concentration of assisted persons in the area. Plaintiffs assert standing under the Administrative Procedure Act, 5 U.S.C. Section 702, which allows persons "affected or aggrieved" by federal agency action to seek judicial review, including injunctive relief, against those agencies, and there has been no contention that the interest plaintiffs seek to protect in this case are not "arguably within the zone of interests to be protected or regulated by the statute ... in question." *Association of Data Processing Serv. Org., Inc. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970). Therefore, plaintiffs have met the standing requirement provided for in the Administrative Procedure Act.

■ HUD argues, however, that plaintiffs lack constitutional standing to assert injury from the destruction of La Plaza Cultural. A plaintiff must meet the constitutional requirements of standing, derived from Article III of the Constitution, which allows the federal courts to adjudicate only actual "cases" or "controversies." *Allen v. Wright*, 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). In order to have such standing, a plaintiff must allege a 1) distinct and palpable injury in fact 2) fairly traceable to defendant's allegedly unlawful conduct 3) which is likely to be redressed by a favorable decision. *See Allen*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324; *Fulani v. League of Women Voters Educ. Fund*, 882 F.2d 621, 624 (2d Cir. 1989). To the extent that there is a difference between the "traceability" and "redressability" components, the former "examines the causal connection between the assertedly unlawful conduct and the alleged injury, whereas the latter examines

the causal connection between the alleged injury and the judicial relief requested." *Allen*, 468 U.S. at 753 n. 19, 104 S.Ct. at 3325 n. 19. Defendants contend that plaintiffs cannot meet the redressability component of standing. In other words, they assert that plaintiffs cannot show that they "would benefit in a tangible way from the court's intervention," *Warth v. Seldin*, 422 U.S. 490, 508, 95 S.Ct. 2197, 2210, 45 L.Ed.2d 343 (1975), because this Court cannot provide for the maintenance of La Plaza Cultural.

In an Article 78 proceeding filed by plaintiffs in state court, the state court found that the various interim leases granted to community residents for gardens and open spaces at the site expired in 1985 and that the Site had never been dedicated for use as a public park. *See Bober v. City Board of Estimate*, No. 19141/88 (Sup.Ct.N.Y.Co. April 14, 1989). Plaintiffs' appeal of the state court's decision was dismissed for failure to prosecute on April 24, 1990, and their motion to reinstate their appeal was denied by the state appellate court on May 29, 1990. The City is also going forward with a summary proceeding commenced on October 13, 1989, to evict all individuals and groups, including the plaintiffs in this action, in state court, with which it apparently intends to proceed regardless of whether the Casa Victoria project goes forward. Tr. 211. HUD argues that the City's right to evict plaintiffs from the site and dispose of the property as it sees fit is independent of the resolution of this action.[2] Since an injunction against the project will not provide for the maintenance of La Plaza Cultural, any injury suffered by plaintiffs from the destruction of La Plaza Cultural may well occur if the Project does not go forward. This Court agrees that since it cannot decree the maintenance of La Plaza Cultural, plaintiffs have no standing to challenge HUD's decision on the basis of this injury. While the Court recognizes the value that plaintiffs attribute to the site, which currently contains a garden, numerous trees, an amphitheater and several murals painted by community members, the current use of the site is not relevant to the undue concentration inquiry.

As plaintiffs argue, the issue of irreparable harm does not ultimately turn on whether plaintiffs have a legal right to continue to use the site as a park. While plaintiffs' primary aim appears to be to prevent the destruction of La Plaza Cultural, plaintiffs also assert that they will be irreparably harmed because the Project will result in an undue concentration of assisted persons in the area, in violation of HUD regulations.

HUD argues that since the number of additional assisted persons in the area from the Project will increase the total assisted housing in the neighborhood by only 0.4 percent, plaintiffs cannot be harmed from this small increase. However, this argument is unpersuasive. Under the regulation at issue, the critical factor is not the total number of housing units in the area but the resulting percentage of assisted units, as compared to the concentration of such units in other areas.

HUD further argues that plaintiffs failed to show that an addition of seventy-nine units occupied by senior citizens would harm the community in any way, and contends that it would instead improve the neighborhood. Plaintiffs assert in their amended complaint that "numerous alternate sites exist on the Lower East Side and elsewhere which are more suitable and whose development will not be destructive to the surrounding neighborhood." Amended Complaint ¶ 26. Defendants argue that this allegation shows that plaintiffs do not really object to the increase in assisted persons in their area as long as the Project is not built on the site occupied by La Plaza Cultural. However, plaintiffs' pleading does not mean that plaintiffs are not alleging harm from an undue concentration. In their amended complaint, plain-

---

**2.** The City states that if the Project is enjoined, it will not convey title to the Sponsor. Torna Aff. ¶ 19. The City further asserts that has no intention of bulldozing the site if the Project is enjoined and, while it has the right to develop the site in a way requiring physical alterations, no physical change in the character of the site by the City is imminent. *Id.* ¶ 20.

tiffs do not define what area they include in their reference to the Lower East Side and some areas of the Lower East Side may have a lower concentration of assisted persons than the area involved in the instant action. While it is clear that plaintiffs would like their park to be preserved, they have also asserted a claim of injury based on the independent ground of undue concentration.

Contrary to HUD's characterization, plaintiffs are asserting more than a right to have the government act in accordance with the law, an insufficient basis, standing alone, for jurisdiction. *See Allen,* 468 U.S. at 754, 104 S.Ct. at 3326. As residents of the area, plaintiffs' interests will be directly and adversely affected if the HUD regulation is violated. *See King v. Harris,* 464 F.Supp. 827 (E.D.N.Y.1979), *aff'd mem., sub nom. King v. Faymor Devp't Co.,* 614 F.2d 1288 (2d Cir.1979), *vacated,* 446 U.S. 905, 100 S.Ct. 1828, 64 L.Ed.2d 256 (1980), *aff'd mem. on remand,* 636 F.2d 1202 (2d Cir.1980) (court found that plaintiffs, individuals living near the proposed housing project and associations representing their interests, had shown irreparable harm because the proposed low-income housing project would further the creation of a low-income and minority area); *see also Shannon v. Dept. of Housing & Urban Dev.,* 436 F.2d 809, 818 (3d Cir.1970) (plaintiffs, residents in an area where a project was built, were found to have standing to challenge HUD's decision because they claimed that the concentration of lower income black residents in a project in their neighborhood would adversely affect their quality of life and their investments in their homes and businesses).

In the case at bar, area resident Tillyard testified that shopping opportunities in the neighborhood for food and clothing are very limited. Tr. 99–100. She also testified that Avenue C and 9th Street is a heavy drug trading corner and that heavy drug trading occurs at crack houses and at certain stores and bars in the area. Tr. 96–97. It is logical to infer that such conditions may be exacerbated by an increase in low-income persons in the area. Plaintiffs therefore have satisfied the requirement of irreparable injury.[3]

## B. Likelihood of Success on the Merits and Balance of Hardships

### 1. Standard of Review

Because this challenge arises under the Administrative Procedure Act, it is the Court's role to determine whether, based on the administrative record developed by the agency, the agency decision was arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law.[4] *See* 5 U.S.C. § 706(2)(A); *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973); *Sierra Club v. United States Army Corps of Engineers,* 772 F.2d 1043, 1051–52 (2d Cir.1985). "Normally, an agency rule would be arbitrary and capricious if the agency had relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to ... agency expertise." *Motor Vehicle Mfr. Ass'n v. State Farm Mut. Auto Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866,

---

**3.** The Sponsor argues that even if the Court were to find irreparable harm, the Project should not be enjoined because the Court could rectify the harm at a later stage through a *post hoc* exercise of its equitable powers. *See L.S.S. Leasing Corp. v. United States General Serv. Admin.,* 579 F.Supp. 1565, 1569 (S.D.N.Y.1984). The Sponsor argues that the Court should allow the financing of the Project to go forward because no harm would result until the commencement of construction. This Court believes that this proposal does not make sense. The City has agreed to transfer the site to the Sponsor only if there is a simultaneous closing on a Section 202 mortgage. If it is determined at a later date that HUD violated its regulations, then the City would have allowed the construction of a Project which would not have been constructed otherwise and plaintiffs' park, although they cannot assert a claim of irreparable injury based upon its existence, would have been destroyed.

**4.** Plaintiffs have not alleged that HUD acted outside the scope of its authority.

77 L.Ed.2d 443 (1983). In reviewing an agency's decision, the Court must:

> consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The Court is not empowered to substitute its judgment for that of the agency.

*Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). *Accord, Schicke v. Romney,* 474 F.2d 309 (2d Cir.1973).

■■■ This Court rejects defendants' argument that it may consider only a six-page HUD memorandum dated February 14, 1990 in determining whether HUD met the applicable regulations. Ordinarily, review of an agency's decision under the standard set forth at 5 U.S.C. 706 is based on the administrative record. However, there are two situations under the Administrative Procedure Act where the Court can properly consider extrinsic evidence. De novo review, in which the court may allow a plaintiff to call his own witnesses, "is appropriate only where there are inadequate factfinding procedures in an adjudicatory proceeding, or where judicial proceedings are brought to enforce certain administrative actions." *Camp,* 411 U.S. at 142, 93 S.Ct. at 1244; *see also Overton Park,* 401 U.S. at 415, 91 S.Ct. at 823. Plenary review, a more limited type of review, is permitted when an agency record is inadequate, incomplete or inconsistent. *Camp,* 411 U.S. at 142, 93 S.Ct. at 1244; *Sierra Club,* 772 F.2d at 1052. When the court engages in plenary review of an agency's decision, the court can obtain the necessary additional explanations of the reasons for the agency decision in the form of affidavits or testimony from relevant agency officials.

■■■ In this case, plenary review is appropriate because the Administrative record was inconsistent in that HUD Re-gional Economist David S. Burns originally rejected the Project because he found it would result in an undue concentration of assisted housing.[5] While Burns later reversed his decision, he claimed that he was pressured to do so by various HUD officials and that he did not believe that the site met the applicable regulations. Furthermore, since there is no regulation which defines "undue concentration," prior methods used to evaluate the site to ensure compliance with the applicable regulations is valuable to explain the different result reached by the various HUD officials who evaluated and reviewed the site and ultimately to shed light on whether HUD's February 14, 1990 decision was arbitrary and capricious. Thus the Court has considered the testimony of HUD official David Burns, as well as that of David Shenk, Director of the Division of Economic and Marketing Analysis and author of the February decision, in determining whether HUD's decision approving the site was arbitrary and capricious or an abuse of discretion.

### 2. HUD's Application of Section 880.-206(d)

■■■ The parties agree that HUD is bound to follow its own regulations. HUD cannot issue a "firm commitment" to a Section 202 project, a prerequisite to closing on Section 202 financing, until HUD evaluates the site selected pursuant to the standard set forth at 24 C.F.R. § 880.206 which mandates that "[p]roposed sites for new construction projects must be approved by HUD as meeting [certain] standards." Plaintiffs claim that the site selection violates the site and neighborhood standard contained in 24 C.F.R. section 880.206(d), which states in relevant part that the site "must ... avoid undue concentration of assisted persons in areas containing a high proportion of low-income persons." Different HUD divisions are responsible for making the various determinations called for by these regulations. It

---

**5.** Since de novo review is inappropriate in this case, the Court has considered the testimony of plaintiff's witnesses, Virginia Tillyard and David Bober, only insofar as it bears on plaintiffs' claim of irreparable harm.

is the responsibility of the Economic Management and Analysis Division ("EMAD") of HUD to evaluate the site to ensure that it satisfies section 880.206(d).

HUD Regional Economist David S. Burns testified as an expert on the EMAD criteria for HUD-funded housing. Burns testified that the following four-step process was used to evaluate compliance with the regulation. First, HUD determines the neighborhood boundaries in order to establish the relevant area. Second, HUD determines the proportion of low-income and assisted persons in the neighborhood. Third, HUD calculates the percentage of assisted housing in the area. Fourth, although Burns indicated that he thought it inappropriate, HUD considers factors such as crime and housing stock conditions if the area contains a fairly high concentration of assisted housing.

Burns originally recommended against approval of the site in a three-page memorandum dated March 2, 1987, finding that "the area was impacted and that additional housing would increase the concentration of assisted persons in a lower income area" in violation of section 880.206(d). Burns defined the "area" as the local neighborhood, consisting of census tracts 28, 26.02 and 24. The boundaries were designated as East 14th Street on the North, East 6th Street on the South, Avenue B on the West, and the East River on the East. Burns determined that 66.6 percent of all housing in the relevant area was assisted. In a second memorandum, also dated March 2, 1987, Burns reconsidered his initial determination in light of "possible new housing and rehabilitation in the designated neighborhood" but did not change his initial recommendation. On April 15, 1987, Burns again refused to change his determination after he was requested by another HUD official to reconsider his decision in light of a termination of another project in the relevant area.

In a May 1, 1987 memorandum, however, Burns altered his previous position and recommended approval of the Project. In his memorandum he stated, "[s]ince the term 'undue' is included in the regulations, it

must be accorded appropriate weight." The reasons stated in the memorandum for his approval of the Project were that few sites in Manhattan would meet HUD cost requirements, the Project represented a very small percentage of New York City's assisted housing which is widely dispersed, and some rehabilitation of housing stock was occurring in the relevant neighborhood. At the hearing, Burns testified that although the facts stated in his memorandum were literally true, he did not believe at the time nor did he currently believe that the factors he discussed were relevant or that the Project met the regulations. Tr. 41–2. Burns testified that other HUD officials persuaded him to change his recommendation, which was the basis for EMAD approval of the site.

HUD made a de novo review of the site on January 31, 1990, after this action was filed. A six-page memorandum, dated February 14, 1990, contains the conclusions of Lawrence Goldberger, Director, Office of Elderly and Assisted Housing, HMA and David Shenk, Director of the Division of Economic and Marketing Analysis, neither of whom played a direct role in the prior decision to approve the project. On January 31, 1990, Shenk and Goldberger spent approximately three to four hours walking around the neighborhood. Shenk and Goldberger met with the commander and public affairs officer of the local police precinct to discuss crime in the area. They also conferred with an official at the New York City Department of Housing Preservation and Development concerning development activities in the area.

Shenk and Goldberger defined the area the same way as Burns. Shenk and Goldberger then determined that the neighborhood is "predominantly low-income," as three-fourths of the households had incomes below 80 percent of median family income and slightly over half had incomes below 50 percent of median family income at the time of the 1980 census. The memorandum noted that there were seven assisted housing projects with a total of 2,915 units, which constituted approximately half of the 5,800 housing units in the area.

At the hearing, Shenk explained that the discrepancy between their determination that 50 percent of the housing in the area was assisted and Burn's determination that 66 percent of the housing was assisted was due to several factors. Shenk testified that he excluded a 200–unit project located outside the relevant census tracts that Burns erroneously included. Tr. 148. Shenk also excluded a 432–unit Mitchell–Lama middle-income cooperative project located at East 10 Street and Avenue C, one block north of the site. Section 880.206(d) makes no distinction between federally and state assisted housing or between different forms of assistance, such as construction financing and direct rent subsidies. HUD asserts that it properly excluded the Mitchell–Lama project, because it interprets "assisted" to include only housing which meets HUD's eligibility criteria for low-income or very low-income assistance. Even assuming that HUD's interpretation of "assisted" is reasonable, Shenk's calculation of the number of assisted units is questionable in view of his admission, on cross-examination, that he did not include three assisted housing projects in the area developed by same sponsor involved in the instant case.[6] Tr. 155–56.

Shenk's memorandum explained that the standard used to determine whether an "undue concentration" of assisted persons existed "was basically our assessment of the physical and social condition of the assisted housing located in the neighborhood, the adequacy of neighborhood services, the social quality (specifically the issue of personal safety as indicated by the incidence of crimes) and the physical development underway and planned." HUD noted that its determination was not strictly based on numerical ratios, but on an assessment of the overall project environment and its impact upon the neighborhood based on these factors. HUD concluded that "there is not now and will not be an undue concentration of assisted persons in the area" based on the following findings: 1) the very slight impact of Casa Victoria's 80 units on the neighborhood's total housing stock; 2) improvement and expected continued improvement in neighborhood conditions, including a reduction in street crime and renovation of housing in progress; 3) adequacy of shopping and services, including existing parks and churches, and a community center to begin construction within a year; 4) private development of market-rate housing; 5) the good condition and maintenance of assisted housing projects in the area; and 6) the expected acceleration of redevelopment in the area, with construction to begin at eight sites by September 1990.[7]

In a March 22, 1990 letter to Joseph B. Lynch, Acting Regional Administrator, objecting to the memorandum's conclusions, Burns criticized the use of these subjective factors and stated that numerical percentages should be the primary determinant of whether concentration in a given area was undue. However, Burns's testimony at the hearing undercut that criticism. At the hearing, Burns testified that had the project site been located on Avenue B instead of Avenue C, he would have approved it, despite the fact that the statistics on undue concentration would have been exactly the same. Burns explained his position by noting the gentrification which had occurred on Avenue B and stating, "you can't be completely rigid when you apply these standards ..." Tr. 69. Burns further testified that in the past he had approved projects where there was a high concentration of assisted housing because other factors made the area desirable. Tr. 60. Burns also testified that he often relied on his gut feelings in determining whether concentration was undue and that,

6. The size of these projects and the type of assistance involved was not definitively established at the hearing. However, it appears clear that the fraction of assisted housing in the area significantly exceeds 50 percent.

7. While HUD cited redevelopment as a basis for approval of the site, three-fourths of the slated

redevelopment involved assisted housing units, although it was not clear what form of assistance was involved. Tr. 139. Shenk's testified that there had been no downward trend in the number of assisted housing units in the area between March 1987 and April or March 1990. Tr. 145–46.

"I think again there is no substitute in the long run for some judgment." Tr. 69. Thus, despite Burn's letter criticizing the standard applied by Shenk, Burn's testimony made clear that he did not disapprove of the use of subjective factors in and of themselves, but that he felt they had been incorrectly applied to the specific site.

This Court finds HUD's application of the so-called subjective factors in its February 14, 1990 memorandum so flawed as to be arbitrary and capricious. One factor on which HUD based its decision was its conclusion that "street crime is not a major problem." Shenk and Goldberger based this conclusion primarily on their conversation with the commander and community affairs officer of the Ninth Precinct, New York City Police Department and their telephone call to the New York City Housing Authority Police. Their conclusion was also based on a conversation with one elderly couple in a neighborhood park. Such anecdotal evidence, gleaned from a single conversation, is of limited probative value, if any.[8]

While the memorandum states that the precinct commander vaguely assured Shenk and Goldberger that the area was improving, it also states that the officers at the local precinct described the precinct as "a high crime area populated with drug addicts," although they indicated that the highest incidence of crime was outside the project neighborhood. Shenk testified that the precinct commander did not provide him with specific information or statistics as to the rate of improvement in the area in terms of the number of crimes committed. Shenk testified that the only numerical evidence which he and Goldberger possessed, supplied by the public housing police, showed that felonies in certain housing projects in the area had increased, not decreased, between 1988 and 1989. Specifically, the number of felonies in the Lillian

Wald, Jacob Riis and Campos projects increased from 335 to 368 between 1988 and 1989. Felonies at the Jacob Riis housing project increased from 123 to 128 in the same period. Thus the only numerical evidence shows an increase, not a decrease, in crime.

HUD argues that area was not noted for violent crime. However, Shenk and Goldberger did not possess crime statistics for the precinct as a whole, which appear essential before a determination could be made that crime, and violent crime in particular, was not a problem in the area. Furthermore, this Court cannot understand how a determination that the crime level was low enough to offset the concentration of low-income persons in the area can be made without knowing how this area compared to other areas of Manhattan in terms of crime rates. The commander and community affairs officer described the area as a "high crime area populated with drug addicts" and the only numerical evidence showed an increase in felony rates between 1988 and 1989. This evidence supports a conclusion that crime was a serious problem in the area. The addition of approximately 113 senior citizens, see HUD exh. C-2, some of whom will be handicapped, appears likely to exacerbate the problem by providing additional highly vulnerable crime victims. HUD notes that Jacob Riis did not rank among the City's "top 30" projects in terms of number of felonies.[9] What appears more relevant in terms of comparison though, is not how Jacob Riis fared relative to other housing projects, but how the rate of crime in the overall area compared to that in other areas of the city. Considering the contrary information which HUD possessed and the additional relevant information which it failed to obtain before reaching its conclusion, HUD's decision that "street crime is not a major

---

8. The Sponsor itself recognizes that, "one individual's experiences have absolutely no probative value in terms of evaluating overall crime statistics in a neighborhood of thousands." Post–Hearing Memorandum in Opposition to Motion for Preliminary Injunction at 32 n. 13.

9. Shenk testified that this ranking was not based on the number of felonies per capita but on the number of felonies overall. Although Shenk did not know how the Jacob Riis project ranked in terms of population among assisted housing developments in Manhattan, he speculated that it was among the largest.

problem" was clearly arbitrary and capricious.

At the hearing, Shenk admitted that one of the memorandum's conclusions was incorrect because it erroneously minimized the impact of the Jacob Riis housing project on the community. Specifically, the memorandum stated, "its location across avenue D is somewhat isolated from the Casa Victoria project site, and we do not expect significant interaction with Casa Victoria residents." At the hearing, Shank admitted that he incorrectly described the Jacob Riis project as "isolated" since it was separated from the project site by only one crosstown city block. Tr. 134. Moreover, there is no evidence that stores, schools, or recreational facilities were situated within the Riis project, which would reduce the likelihood of interaction with other area residents. Furthermore, this Court has grave doubts whether, based on a three-or-four-hour visit to a sixteen-block area, Shenk's original conclusion could be reliably drawn since it is unlikely that a brief observer of the neighborhood could distinguish between residents and nonresidents of Jacob Riis. Considering that the Jacob Riis Project constitutes almost one-third of the housing units in the relevant area, this error is significant. Given HUD's admitted error, the Court has no clear picture of the impact on the area of the Jacob Riis project and its effect on the undue concentration inquiry. Shenk has admitted that there is no rational connection between the facts found—that the Jacob Riis project was isolated from the community—and the decision that this ameliorated the effect of the high concentration of assisted persons in the area.

The errors and omissions described above, when taken as a whole, demonstrate that Shenk's decision likely lacked a "rational connection between the facts found and the choice made." *Motor Vehicle Mfr. Ass'n*, 463 U.S. at 43, 103 S.Ct. at 2866. This Court finds that plaintiffs have shown a substantial likelihood of meeting the admittedly heavy burden of showing that HUD made a "clear error in judgment." *See Id.; Falk v. Secretary of the Army*, 870 F.2d 941, 945 (2d Cir.1989).

**3. HUD's Interpretation of Section 880.-206(d)**

The problems which this Court has found with respect to HUD's February 14, 1990 decision are illustrative of a larger problem in this action, HUD's interpretation of the meaning of section 880.206(d). Plaintiffs claim that HUD's interpretation of "undue concentration" is a violation of the regulation itself.

■ "[A]n agency's construction of its own regulations is entitled to substantial deference." *Lyng v. Payne*, 476 U.S. 926, 939, 106 S.Ct. 2333, 2341, 90 L.Ed.2d 921 (1986); *New York v. Lyng*, 829 F.2d 346, 350 (2d Cir.1987). Plaintiffs must show that the agency's interpretation of the regulation is "plainly erroneous or inconsistent with the regulation." *United States v. Larionoff*, 431 U.S. 864, 872, 97 S.Ct. 2150, 2155, 53 L.Ed.2d 48 (1977) (quoting *Bowles v. Seminole Sand Co.*, 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945)). The Court must defer to the agency's interpretation unless an "alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation." *Gardebring v. Jenkins*, 485 U.S. 415, 430, 108 S.Ct. 1306, 1314, 99 L.Ed.2d 515 (1988).

■ Defendants assert that HUD enjoys wide latitude in interpreting regulations to effectuate Congress' broadly outlined policies. *Japan Whaling Ass'n v. American Cetacean Soc'y.*, 478 U.S. 221, 233, 106 S.Ct. 2860, 2867, 92 L.Ed.2d 166 (1986). HUD argues that this Court should defer to its experience in developing and selecting the appropriate criteria. *See Lyng*, 829 F.2d at 350.

While such deference is clearly due, this Court cannot sanction such a broad exercise of discretion as to eviscerate the very meaning of the term "undue concentration" in the applicable regulation. The effect of deferring to HUD in this case would be to give HUD an effectively unlimited license to build assisted housing regardless of the concentration of such housing in the

area. Unless the term "undue concentration" is given some objective meaning, HUD can use subjective factors, such as the existence of stores or community services in the area, to support whatever result it desires to reach. It is not necessary, or perhaps even appropriate, for this Court to specify what the appropriate meaning is. However, the Court does find, based on the present record, that there is a substantial likelihood that the treatment accorded the regulation by HUD in this case does not comport with any reasonable interpretation of its terms.

### a. Purpose of the Regulation.

■ Congress created the Section 8 Housing Assistance Program in the United States Housing Act of 1937 (the "1937 Act"), 42 U.S.C. §§ 1437–1437j:

> [f]or the purpose of aiding lower-income families in obtaining a decent place to live and of promoting economically mixed housing.

42 U.S.C. § 1437f(a) (1937).

In Section 5301(c) of the Housing and Community Development Act of 1974 (the "1974 Act"), Congress stated:

> The primary objective of this chapter is the development of viable urban communities, by providing decent housing and a suitable living environment and expanding economic opportunities, principally for persons of low and moderate income.

42 U.S.C. § 5301(c). A specific objective of the 1974 Act is

> "the reduction of the isolation of income groups within communities and geographical areas and the promotion of an increase in diversity and vitality of neighborhoods through the spatial deconcentration of housing opportunities for persons of lower income and the revitalization of deteriorating or deteriorated neighborhoods to attract persons of higher income." 42 U.S.C. § 5301(c)(6) (1974).

The 1974 Act sought to make cities "more livable, attractive, and viable places in which to live." S.Rep. No. 93–693, 93rd

Cong., 2d Sess., reprinted in 1974 U.S.Code Cong. and Ad.News 4273, 4274. When Congress enacted the 1974 Act, it recognized that "the Nation's cities ... face critical social, economic, and environmental problems arising in significant measure from ... the concentration of persons of lower income in central cities." Pub.L. No. 93–383, Title I, § 101(a), Aug. 22, 1974, 88 Stat. 633 (codified at 42 U.S.C. § 5301(a)). *See Alschuler v. Dept. of Housing & Urban Devp't,* 686 F.2d 472, 478 (7th Cir. 1982). Congress therefore required HUD's local housing assistance plans to "indicate the general locations of proposed housing for lower-income persons with the objective of ... avoiding undue concentration of assisted persons in areas containing a high proportion of low-income persons." 42 U.S.C. § 5304(a)(4)(C)(ii). Congress thus imposed a "heavy burden" on HUD to promote economic integration in administering the section 8 program. *See King,* 464 F.Supp. at 837.

Section 880.206(d), previously located at 25 C.F.R. section 880.112(d), replicates the above-quoted language of section 5304(a)(4)(c)(ii) of the 1974 Act. *See Alschuler,* 686 F.2d at 479; *Aertsen v. Landrieu,* 637 F.2d 12, 22 (1st Cir.1980). HUD argues that the goal of revitalizing deteriorating neighborhoods and providing attractive places to live may increase the concentration of assisted persons in those neighborhoods. The need to balance these potentially competing goals, HUD argues, requires that HUD be given wide latitude in interpreting its regulations. *See Japan Whaling,* 478 U.S. at 233, 106 S.Ct. at 2867.

HUD argues that the review it undertook was consistent with HUD's longstanding method of determining whether a proposed site will result in an undue concentration of persons, which allows for the use of subjective factors.[10] As sole support for this assertion, HUD points to a June 7, 1979 memorandum from Marilyn Melkonian, Acting Deputy Assistant Secretary, Division of Multifamily Housing Programs to I. Margaret White, Area Manager, Richmond

---

10. This assertion was contradicted by Burns, who testified that, at one point, the HUD evaluation was made on a strictly numerical basis. Tr. 19.

Area Office, which interpreted the meaning of "undue concentration:"

'[u]ndue concentration' is, indeed, the most difficult term to interpret. A 'concentration' is permitted, but an 'undue' concentration is not. Clearly, the uncritical use of a percentage such as 40 percent or 50 percent could result in disapproval of a project in an area where the concentration is not 'undue.' For example, subsidized elderly housing may comprise 40 percent of the households in a low income area, and yet the physical and social quality of the area may be good, and the addition of another elderly project may even result in the provision of better services and facilities for the elderly.... The factors to be considered in determining whether or not an 'undue concentration' exists include: an evaluation of the physical condition of the assisted housing concentration; an assessment of the adequacy of the services, facilities, and amenities in the area; and an evaluation of the social quality of the area (does it have a high crime rate as compared to other areas in the locality, do nonassisted families find the area desirable, etc.).

There is no indication that HUD adopted this interpretation as its official policy or circulated it to those responsible for implementing the regulation.

There are no HUD regulations which define "undue concentration." [11] Shenk stated that he interpreted the statute to mean that "once the economist has looked at the numbers and the statistics, he is looking to see whether or not this project will have an adverse impact on the area, whether the area is the type where it would adversely impact on a project." Tr. 112. While such an analysis may be reasonable in the absence of the regulation, it does not appear to comport with the approach contemplated by the regulation. The regulation does not provide that HUD should evaluate the neighborhood and approve the project if it believes that it would not adversely affect the neighborhood or vice versa. The regulation does not speak in terms of adverse impact but in terms of undue concentration.

HUD directs this Court's attention to several cases approving HUD determinations that a particular site satisfied the requirements of section 880.206(d), relying in part on subjective factors. In *Business Ass'n of University City v. Landrieu*, 660 F.2d 867 (3rd Cir.1981), HUD examined the number of assisted units in the relevant census if the project were built and determined it would result in 2.8 percent assisted units in the area. HUD also examined the number of assisted housing units within a half-mile radius of the site, including the project, which resulted in 5.8 percent assisted units, the city-wide average in Philadelphia. The Court, in upholding HUD's decision as not arbitrary and capricious, remarked that factors such as the surrounding neighborhood, transportation, and commercial patterns, are relevant to a determination whether an "undue concentration" of assisted persons would result. *Id.* at 876.

In *Aertsen v. Landrieu*, 637 F.2d 12 (1st Cir.1980), the court determined that HUD's

---

**11.** On January 24, 1988, HUD published for comment proposed regulations, which were not adopted, to clarify and define the term "undue concentration." *See Aertsen*, 637 F.2d at 23. The proposed regulations stated in relevant part:

(3) whether a site is in an area of undue concentration of federally-assisted housing. The area, as determined pursuant to paragraph (a)(1), of this section shall be determined to be an area of undue concentration of federally-assisted housing if a substantial number of the housing units in the area (generally over 40 percent) consist of housing (i) constructed, rehabilitated or purchased, leased (exclusive of units leased under the Section 8 Existing Housing Program (24

C.F.R. Part 882) under the United States Housing Act of 1937 (42 U.S.C. 1437f)), Sections 221(d)(3) BMIR, 235, or 236 of the National Housing Act (12 U.S.C. 1715L(d)(3), 1715z and 1715z–1), Section 101 of the Housing and Urban Development Act of 1965, (12 U.S.C. 1701s), or Section 515 of the Housing Act of 1949 (42 U.S.C. 1485) and (ii) intended for occupancy by other than elderly households.

Although this regulation is obviously not determinative because it was not adopted, this Court notes that subjective factors played no part in the analysis, and that the suggested 40 percent limit is substantially exceeded, even by HUD's own calculations, in this case.

finding that there was no undue concentration of assisted persons in the area was supported by substantial evidence where the percentage of assisted housing in the area was between 38 and 39.4 percent, based on the fact that the site met both the proposed but unadopted HUD regulation and the standard recommended to HUD's Boston office by a Boston Task force, that when the percentage of assisted persons in an area exceeded 150 percent of the percentage of assisted persons in the entire city, further investigation as to whether the area was unduly concentrated was required. The court found it relevant that HUD had determined that " 'the [relevant area] is an area of revitalization in which public and private investment is significant.' " *Aertsen*, 637 F.2d at 23.

Finally, in *Loveland v. Pierce*, 564 F.Supp. 76 (S.D.Ohio 1983), plaintiffs challenged a HUD decision in part for considering that there was a lack of alternative acceptable sites in the county. HUD had noted in its determination that the city of Loveland, where the assisted project was to be built, contained a significantly lesser share of lower-income persons than the overall market area, including Cincinnati. The court, in upholding HUD's determination, stated, "HUD has a wide range of discretion in selecting methods of analysis that are not to be second-guessed by this Court unless clearly in error or unless the record indicates that HUD did not take into account the appropriate factors." *Id.* at 83. The court also noted that the city of Loveland, where the project was to be built, had nine thousand residents and one hundred seventy five units of assisted housing. *Id.* at 81.

The case at bar differs from the above-cited cases in two respects. First, it appears that the percentage of assisted housing in the area at issue here is far greater than in those cases. Thus, the concentration of assisted persons standing alone may not have been undue in those cases even if subjective factors had not been taken into account. Second, in all three cases, the courts noted the percentage of assisted housing in the relevant area in relation to the percentage of assisted housing in the relevant city or county as a whole. The Court in this case has not been provided with such evidence and it appears that HUD did not obtain or consider such information in making its determination.

HUD's construction of the term "undue concentration" gives little if any significance to the relative concentration of assisted housing and gives transcendent importance to extraneous factors. This is confirmed by Shenk's testimony that section 880.206(d) would not preclude the building of assisted housing in an area with a ninety-percent concentration of low-income persons. Tr. 165. In view of that testimony, it is difficult to imagine an area in which HUD would find an undue concentration of assisted persons. While the regulation may be sufficiently flexible to permit consideration of factors other than the concentration of assisted housing in the area, the investigation must at least begin with that factor. It may even end there, for there are surely areas in which the percentage of assisted housing is so high that to permit that factor to be overridden by extraneous considerations would render the regulation a nullity and defeat the statute's express purpose of avoiding the isolation of income groups. *Cf. Karlen v. Harris*, 590 F.2d 39, 45 (2d Cir.1978), *rev'd, Strycker's Bay Neighborhood Council, Inc. v. Karlen*, 444 U.S. 223, 100 S.Ct. 497, 62 L.Ed.2d 433 (1980) ("[o]nce the area is committed to a high concentration of low-income housing, the Congressional purpose of racial and economic integration is thwarted.") In the present case, HUD has paid only lip service to the requirements of its regulation and the purpose of the statute and has accorded predominant weight to superficially investigated and vaguely expressed subjective considerations. In so doing, it has acted contrary to the clearly expressed intent of the statute and the regulation.

## II. Relief against the City

▮ Plaintiffs claim that the City is a necessary party to these proceedings pursuant to Rule 19, Fed.R.Civ.P. This Court agrees with the City's position that the

requirements of Rule 19 are not met, as complete relief in the claim against HUD can be granted without restricting the City's right to use the property as it sees fit.

Furthermore, the requested relief against the City would require this Court to stay the pending state court action commenced on October 13, 1989, in violation of the Anti–Injunction Act.[12] This earlier-filed civil court action, seeking to evict the present occupants of the park site, must be allowed to proceed without interference from this Court.

## III. Rule 65(a)(2) Request

■ In their post-hearing papers, plaintiffs request a ruling pursuant to Rule 65(a)(2) to consolidate the hearing testimony with the trial on the merits. Defendants were not alerted in advance of trial to prepare for a trial on the merits, and this Court cannot order consolidation unless it has no prejudicial effect on defendants' ability to present a full case on the merits. *Woe v. Cuomo*, 801 F.2d 627, 629 (2d Cir. 1986). HUD does not object to a ruling pursuant to Rule 65(a)(2) provided that the Court applies the narrow standard of review required by *Sierra Club*, 772 F.2d at 1051–52. The Sponsor does not object provided that the Court limits its review to the written administrative record. Because this Court has determined that it was necessary to go beyond the written record, it defers to the Sponsor's contention that it

will be prejudiced if it is not allowed to present additional evidence. Furthermore, in light of this decision, the Court would find it useful, at the trial on the merits, if HUD provided it with, for example, relevant comparisons to other projects which have been approved or disapproved on the basis of undue concentration, as well as a comparison of the number of assisted persons and assisted housing units in this area with other areas in New York City.

## CONCLUSION

■ For the aforementioned reasons, plaintiffs have adequately shown that they will suffer irreparable harm and a likelihood of success on the merits. Plaintiff's motion, insofar as it sought an injunction restraining the use of federal funds for the clearance of the site and construction of the Project, is granted.[13]

SO ORDERED.

---

**12.** The Anti–Injunction Act, 28 U.S.C. § 2283, provides:

A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.

**13.** The Sponsor asks this Court to order plaintiffs to post a security bond in the amount of $400,000, the amount which the Sponsor estimates it will lose in money and resources, if a preliminary injunction is granted. *See* Rule 65(c), Fed.R.Civ.P. While Rule 65(c) appears mandatory, courts may decline to require the posting of a security bond. *See United States v. Bedford Assoc.*, 618 F.2d 904, 916–17 n. 23 (2d Cir.1980), *cert. denied*, 456 U.S. 914, 102 S.Ct. 1767, 72 L.Ed.2d 173 (1982); *Holborn Oil Trading, Ltd. v. Interpetrol Bermuda, Ltd.*, 658

F.Supp. 1205, 1211 (S.D.N.Y.1987); *Bass v. Richardson*, 338 F.Supp. 478, 489–90 (S.D.N.Y.1971). Plaintiffs in this case were unable to post the $5,000 bond ordered on May 1, 1990 in connection with the temporary restraining order. Since plaintiffs apparently do not have sufficient resources to post a security bond, they would be precluded from maintaining this action if such a bond were required. Moreover, in the event that the preliminary injunction was wrongfully issued, the Sponsor's past expenditures would not be affected and this Court is not persuaded that the Sponsor would be unable to renegotiate its construction contract with its original contractor, who did not receive the contract on the basis of a competitive bidding process, or find a new contractor to complete the Project within HUD's permissible mortgage amounts. Under these conditions, the Court declines to order the posting of a security bond.